In the

# United States Court of Appeals
### For the Seventh Circuit

———————————

No. 18-2214

TEREZ COOK,

*Petitioner-Appellant,*

*v.*

BRIAN FOSTER, Warden,

*Respondent-Appellee.*

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 13-CV-989 — **Nancy Joseph**, *Magistrate Judge.*

———————————

ARGUED OCTOBER 3, 2019 — DECIDED JANUARY 29, 2020

———————————

Before WOOD, *Chief Judge*, and BARRETT and SCUDDER, *Circuit Judges.*

WOOD, *Chief Judge*. Federal courts do not lightly grant petitions for a writ of habeas corpus brought by state prisoners. As the Supreme Court put it in *Harrington v. Richter*, 562 U.S. 86 (2011), if the "standard [for relief] is difficult to meet, that is because it was meant to be." *Id.* at 102. Nonetheless, "difficult" does not mean "impossible," as the Court reaffirmed in *Richter*: "The writ of habeas corpus stands as a safeguard

against imprisonment of those held in violation of the law."
*Id.* at 91. Our task in the present case is to decide whether
petitioner Terez Cook demonstrated that Wisconsin's court
of appeals unreasonably assessed his contention that he did
not receive the effective assistance of counsel guaranteed by
the Sixth Amendment. See *Strickland v. Washington,* 466 U.S.
668 (1984). The district court thought that Cook's showing
fell short, but we conclude that he is entitled to relief. We
therefore reverse.

## I

Cook's criminal case arose out of a home invasion that
took place in Peshtigo, Wisconsin, in May 2005. The state
charged Cook and another man, John Egerson, with armed
robbery, armed burglary, false imprisonment, battery, theft,
and mistreatment of an animal causing death. The jury con-
victed Cook on all counts, as a party to the crimes and as a
repeat offender. Throughout these proceedings Cook's basic
contention has been that the state identified the wrong man
as Egerson's accomplice.

We begin with an overview of the trial, to provide a
framework for the particular ways in which Cook contends
that he received constitutionally ineffective assistance of
counsel. We then address each error individually, and finally
we consider whether, taken as a whole, they add up to a
Sixth Amendment violation.

First, we provide the cast of key characters:

- Terez Cook: defendant accused of the home-
  invasion crimes; possibly the same person as "BN"
  or "Rex"

- John Egerson: co-defendant, tried separately and convicted

- Ashley Sadowski: Egerson's girlfriend and accomplice to the home-invasion crimes

- Jessica Babic: Sadowski's friend, and accomplice to the home-invasion crimes

- David Hall: long-time friend of Egerson, and also friends with Sadowski, Babic, and an ex-boyfriend of the victims' daughter; Cook alleges that Hall, not he, was Egerson's accomplice.

- Stacy Thede: Cook's girlfriend

- Jimmy and Margaret Harper: the victims

The events underlying this case unfolded as follows. Egerson and Sadowski believed that there was marijuana in the Harpers' garage, and they wanted to steal it. Around midnight on May 22, 2005, Sadowski and Babic met up with Egerson and Cook. At 2:30 a.m. or so Sadowski, Babic, Egerson, and another man (Cook or "Rex," according to the state; Hall, according to Cook) went to Walmart; there, at Egerson's urging, Sadowski and Babic bought gloves, bandanas, and duct tape. So equipped, Sadowski drove Egerson's car past the Harpers' home; she tapped the brakes when she reached the front of the house in order to signal to the men, who were following in Sadowski's car, which house to target. The women then waited nearby for the men to do the job.

Around 4:00 a.m., Egerson called Sadowski and told her that he had crashed her car after stealing cash and speakers from the Harpers' home. The women picked up Egerson and

his companion and drove to a hotel in Green Bay. About six hours later, Egerson dropped Sadowski and Babic (but not Cook, it seems, who disappears at that point from the state's story) at a gas station in Peshtigo. The women called Hall for a ride to Babic's house. There they were greeted by the police, who arrested Hall and took the women into custody for questioning. After initially denying any involvement in the crime, Sadowski and Babic admitted their involvement and named Egerson as one of the robbers.

Putting together evidence from these interviews, along with cell tower evidence, the state obtained an information charging Cook and Egerson with the crimes. They were tried separately, though by the same judge. In a trial that the presiding judge later characterized as unworthy of confidence, the jury convicted Cook and the judge sentenced him to 40 years in prison and 18 years of extended supervision. His conviction was affirmed on direct appeal in the Wisconsin courts. At that point Cook (acting *pro se*) filed a petition for postconviction relief pursuant to Wis. Stat. § 974.06; in it, he alleged ineffective assistance of his trial counsel, Alf Langan, and his appellate counsel, Milton Childs. The court appointed postconviction counsel for Cook and ultimately held evidentiary hearings over the course of three days. It concluded that Cook's motion had to be granted because of the cumulative effect of trial counsel's many missteps. In so ruling, the court stressed the exceptional nature of the case:

> You know, I've been on the bench 20 years, and I can't remember ever granting a new trial because of ineffective assistance of counsel. It may have happened, but I can't as I sit here today recall. It's a heavy decision. I understand that.

\*\*\*

> I've given it a lot of thought. And the bottom line is that the deficiencies are so big that I would have to conclude if it had been tried correctly, that there's a probability of a different result and that confidence of the Court has been shaken as to the results because of the deficient performance.

Doc. 62-10 at 153–54.

The state appealed from the trial court's decision, and the Wisconsin Court of Appeals reversed. Cook then filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, which a magistrate judge, proceeding by consent of the parties under 28 U.S.C. § 636(c), denied. Despite its conclusion that the state appellate court, in resolving some of Cook's claims, had unreasonably applied *Strickland* or unreasonably determined the facts, the district court thought that there was enough to squeak by under the deferential standard that applies to these cases. Because of the disagreement between the state trial and appellate courts, however, it granted Cook a certificate of appealability. See 28 U.S.C. § 2253(c).

## II

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court is not authorized to issue a writ of habeas corpus on a claim rejected by a state court on the merits unless the state-court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or was "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d). A state court unreasonably applies federal law if it correctly identifies the governing Supreme

Court precedent but unreasonably applies its holding to the facts of the case. See *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). A state-court decision involves an unreasonable determination of the facts if the court finds that "the factual premise was incorrect by clear and convincing evidence." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); see also *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015) (facts may not be set aside if "reasonable minds reviewing the record might disagree about the finding in question").

With these principles in mind, we turn to the specifics of Cook's case. At this stage of the proceedings, with the assistance of able recruited counsel, Cook has identified six respects in which Langan rendered ineffective assistance of counsel. He has not raised any argument about the lawyer who represented him in his direct appeal, and so we have nothing to say about that. We address each specific contention of defective performance separately. We then turn to the question of prejudice, which we assess by evaluating the trial as a whole, not one slip at a time.

## III

### A

1.  Failure to locate and produce Hall at trial

Hall, as we noted, is the person who Cook insists was Egerson's accomplice for the robbery. Cook's theory of defense was that he backed out of the robbery at the last minute. He did not contest the fact that he was with Egerson, Sadowski, and Babic on the morning of the crime. He maintained, however, that he "decline[d] to go along" with the break-in, and Hall took his place. Calling Hall the "biggest hole" in the state's case, Langan argued that the police failed

adequately to investigate his involvement. Despite arresting Hall with the women the morning after the robbery, officers did not test for his DNA on a headwrap and glove found in Sadowski's car. They *did* test for Cook's DNA but did not get a match on these items. Cook's DNA was, however, found on a cigarette in Sadowski's car. Langan was also able to put before the jury the following facts: Egerson and Hall had known each other since childhood; Hall was friends with Sadowski, Babic, and an ex-boyfriend of the Harpers' daughter; Hall had stopped by Babic's house twice on the night of the robbery; and neither Sadowski nor Babic had told the police about Hall's visits. Babic and Sadowski both denied that Hall was involved in the robbery.

But the jury never saw Hall, because Langan did not subpoena him to testify at Cook's trial. Worse, he made no effort to locate Hall. When the judge asked about this outside the presence of the jury, Langan reported that Hall was "in prison." The judge then stated, "at least you know where to find him, and you could get a writ to produce him," but Langan said that he had been unable to figure out which prison Hall was in. (Wisconsin has a readily available inmate locator system. See https://offender.doc.state.wi.us › lop. Moreover, it turned out that Hall was not in prison, nor was he in hiding; he was working in the open and reporting to a probation officer.) The judge worried that "if a fair trial to Mr. Cook hangs in the balance," Hall's presence may be necessary to allow the jury to "eyeball him and give some consideration to this notion, that maybe it was Egerson and Hall and not Cook and Egerson." Langan did introduce a photo of Hall to the jury. Both Cook and Hall are African-American men of roughly the same age and build.

Notwithstanding Hall's centrality to Cook's theory of defense and Langan's lassitude in attempting to explore his role in the events, the state appellate court found neither deficient performance nor prejudice in this respect. This is hard to understand, as reasonable professional performance includes the duty to investigate. *Wiggins v. Smith*, 539 U.S. 510, 522–23 (2003); *Strickland*, 466 U.S. at 691. The district court, in contrast, concluded that the state appellate court's "finding that Cook failed to establish deficient performance as to Langan's failure to find Hall before trial is an unreasonable application of *Strickland*." We agree with the latter assessment. We add that counsel's failure to investigate cannot be cured by later discovered facts—in this instance, that Hall for a time had absconded while on parole. See *Wiggins*, 539 U.S. at 526–27 (rejecting "strategic decision" for attorney's performance relied on by state court as a "*post hoc* rationalization").

Had the jury seen Hall, it is reasonable to conclude that there would have been strong corroboration of some damning evidence: both Sadowski and Babic were friends with Hall; Hall had known Egerson since childhood; Hall stopped by Babic's home twice on the night of the robbery; neither woman told the police about Hall's visit; and Hall was arrested at Babic's house the next day. It is true that Hall did not blurt out a confession at the postconviction hearing, but that does not mean that his presence before the jury would have had no impact. The content of his testimony is relevant instead to the question of prejudice.

The state appellate court also opined that Hall's presence at trial *would not have* lessened the impact of the women's testimony identifying Cook as the second robber, particular-

ly since Cook admitted that he was with them shortly before the robbery. (Note that the jury never learned of the lenience both women expected from the state, either—here as elsewhere, the errors Cook asserts are intertwined.) The standard, however, is not whether Hall *would have* exonerated Cook; it is whether the absence of Hall's testimony undermines our confidence in the jury's verdict that Cook was the one involved in the crime. This is troublesome, even though the court elsewhere phrased the test properly. We conclude that counsel's failure even to try to obtain Hall for the trial represented deficient performance.

2. Failure to object to hearsay testimony, unsupported by a proper foundation, about cell phone records

The jury heard that the police learned that around 4:00 a.m. on the day of the robbery, Egerson's cellphone had received calls from a phone that they tracked first to Stacy Thede, Cook's girlfriend, and ultimately to Cook. This information came in through the testimony of Detective Baldwin, who said that the records revealed that the calls hit cell towers near the Harpers' home. Thede told detectives that she had bought the phone for Cook, but that a few days before the robbery, he told her that he had lost it. The officers took Cook into custody for questioning.

Langan did not object to Baldwin's testimony about the phone records, even though the state did not introduce them into evidence. His failure to object was serious, because this testimony provided the critical link between Cook's phone and the robbery and thus enabled the police to locate Cook. And it was worse than inadvertent: outside the presence of the jury, the trial judge expressed concern that "so much" hearsay about the phone records and tower hits was coming

in through the detective's testimony. Langan responded that he thought the state was going to introduce the telephone records, which he had reviewed during discovery. The state never did so.

Langan's disregard of the cellphone evidence does not stand in isolation from other moving pieces. The state appellate court saw the use of Cook's phone during the crime as evidence of his involvement. Yet, it concluded, other evidence proved a similar point and thus diluted the impact of the missing records. The state court observed that a DNA swab found on a cigarette from Sadowski's car matched Cook's DNA, and it stated that "Cook eventually admitted that he was in Peshtigo *and was with Egerson, Sadowski, and Babic at the Walmart* and after the home invasion … ." But the latter statement does not appear in the record.

In its brief, the state asserted in several places (consistently with the state appellate court) that Cook told the police not only that he was with Babic, Sadowski, and Egerson before the robbery, but also—and this is important—that Cook "admitted that he was in the Walmart parking lot with the others when Egerson directed the two women to purchase gloves, bandanas and duct tape after 3 a.m. shortly before the home invasion." We found no record support for this statement, and at oral argument we invited counsel to direct our attention to whatever he could find. That supplemental letter has not assuaged our concerns. The closest the state was able to come was a statement from Baldwin reporting that he believed that Cook said that he had been in the Walmart parking lot, with no reference to time and no reference to Egerson's alleged instructions to the women. And Baldwin admitted that Cook never said he went into the

Walmart. Thus, we find the state's brief overstated perhaps the most material facts in the case. This is concerning, for, if true, the state's characterization would mean that Cook admitted to being with Egerson, Babic, and Sadowski at the very location, at the very time, and for the very purpose of purchasing the very supplies used to commit the robbery. But the state's characterization is inaccurate: the trial testimony supports no more than Cook perhaps admitting he was at the Walmart at some unspecified time before the robbery. Nowhere did he admit the broader storyline the state pressed in its brief.[1]

This is a serious misapprehension of the facts: without the Walmart parking lot evidence, the error with the cellphone records becomes critical. Because of its mistake, the state appellate court found adequate performance and said nothing about prejudice. We, however, cannot agree with respect to performance. Once again, Cook's attorney failed to undertake the necessary background work and thereby left a glaring gap in the evidence. Langan knew that the state had no witness from the phone company and would not be able to establish a foundation if the court sustained an objection. The records directly linked Cook (or, more accurately, his cellphone) to the 4:00 a.m. getaway call. And, as the district court noted, the argument Langan actually made—that the phone had been stolen—pales in comparison to the evidence the jury heard about the cell phone tower hits in the vicinity of the robbery near the time of the robbery. The cellphone evidence also corroborated Sadowski and Babic's testimony

---

[1] The state shoulders a weighty obligation to play entirely straight with facts that affect a person's liberty. Too much is at stake for all involved to see what we did here from the state.

that they received Egerson's call from Cook's phone after the robbery. Nothing explains Langan's lack of effort to keep it out. In this respect as well, his performance was deficient.

3. Failure to bring out the *de facto* immunity the state had given to Sadowski and Babic in exchange for their testimony

Everyone recognized that the credibility of Sadowski and Babic was pivotal to the prosecution's case. Once again, Langan left essential work undone. And once again, it cannot be because it slipped his notice. The judge held a sidebar and expressly asked whether law enforcement had promised immunity or other concessions to Sadowski or Babic or both; he described Langan's failure to explore this issue as "strange." At the judge's prompting, but without the jury present, Langan finally questioned both women about a potential deal. Babic testified that she gave her statements to law enforcement with the understanding that she would not be charged, and that she thought she had immunity. Nonetheless, Langan dropped the matter there; he did not elicit this testimony from Babic in front of the jury. He did briefly question Sadowski about a possible immunity deal in front of the jury but did not press the point. And when the time came for jury instructions, Langan did not request anything about accomplice witnesses or concessions granted to witnesses. He did, however, attempt to undermine Babic and Sadowski's credibility throughout the trial by pointing out the inconsistencies in their testimony, their lies to police, and their overall lack of credibility.

The state appellate court concluded that this omission did not reflect deficient performance. Counsel knew, from the sidebar we described earlier, that Babic believed that she

had an immunity deal with the state in exchange for her testimony. Yet Langan left this unexplored in open court. He never established that Babic had not been charged but could be. Whether or not there was a formal immunity agreement, that would have been powerful impeachment evidence. See *Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006), citing *United States v. Bagley*, 473 U.S. 667, 676 (1985). Given the centrality of Babic's role in the state's case, the failure to bring out Babic's motives for testifying fell below an objectively reasonable level of performance.

Langan asked Sadowski only four questions on this point, and her testimony was equivocal. Nonetheless, he brought out the fact that she was at risk of being charged but had not been. He had no explanation for the difference in his questioning of the two. Indeed, he testified at the postconviction hearing that he could not remember why he did not question Babic in front of the jury and that perhaps he "forgot" to do so. See, *e.g.*, *Woolley v. Rednour*, 702 F.3d 411, 423–24 (7th Cir. 2012) (finding "no strategic rationale" underlying counsel's failure to secure expert testimony where counsel admitted his failure was an oversight).

Both the state appellate court and the district court found that Langan's performance was not so flawed as to be constitutionally deficient in these respects. We consider this a close call. Cook argues that walking the jury through Babic's understanding of her immunity would have better exposed her motivations to protect herself by testifying the way the state wanted. Perhaps so. On the other hand, the fact that Babic was an accomplice to the crimes and thus was motivated to cooperate with the state was developed through other testimony. Finally, Langan did point out inconsistencies within

Babic's testimony and between Sadowski's testimony and hers and discussed their motives to lie in his closing argument. Perhaps standing alone, this episode would not justify a finding of constitutionally deficient performance. But it is another negative factor when we assess counsel's performance as a whole.

Related to the *de facto* immunity point is Langan's decision not to request a jury instruction advising caution with the reliability of the testimony of accomplices. At the post-conviction hearing, he explained that he did not do so because he was satisfied with the general instruction on witness credibility. The latter instruction tells the jury to consider bias, motives for falsifying testimony, and the witnesses' interest in the result of the trial. Although the more specific accomplice instruction contained a stronger admonition, the state court reasonably concluded that Langan's choice lay within the broad bounds of acceptable performance. We thus place no weight on that aspect of his work. The same is true of the state appellate court's assessment of the lack of a special instruction on immunity.

4.  Failure to object to Margaret Harper's unanticipated in-court identification of Cook

Throughout the period leading up to the trial, neither Jimmy nor Margaret Harper was able to describe the intruders to police. Their daughter recalled only that both were African-Americans. The police showed Margaret photo arrays (all of which included Cook's picture), but she did not identify anyone as her attacker.

At trial, however—and to Langan's astonishment (but not that of the prosecutor, who knew what was coming)—

Margaret took the witness stand and identified Cook, the on-
ly black man in the courtroom, as her assailant. After elicit-
ing testimony that Margaret saw her assailant's eyes during
a physical struggle, the prosecutor asked if "anything [had]
happened since this incident that would help [her] identify
this person." Margaret replied that she had seen Cook's eyes
in court and told her family, "I will never forget those eyes if
I ever saw them again, and I just had a flashback when Mr.
Cook looked at me this morning." Langan neither objected,
moved to exclude this testimony as unduly prejudicial under
Wis. Stat. § 904.03, nor moved for a mistrial. He did, howev-
er, address her "flashback" in his closing argument. He
pointed out that it was dark that night; that events were un-
folding quickly; that the attacker, with "bugged out" eyes,
was screaming at her; and that she had consistently failed to
recognize Cook's picture in the photo arrays. Addressing the
obvious, he also commented that "given the racial makeup
of this area there's a decent possibility that this trial is the
closest that she's ever been to a black man since the night of
the robbery." In light of all that, he urged the jury to find
that the state had not shown Cook's guilt beyond a reasona-
ble doubt.

The state appellate court determined that counsel's per-
formance was not deficient, because the in-court identifica-
tion was admissible under the then-controlling case of *State
v. Marshall*, 284 N.W.2d 592 (Wis. 1979). In *Marshall*, the Su-
preme Court of Wisconsin held that the state exclusionary
rule applicable to unnecessarily suggestive identification
procedures did not apply to spontaneous identifications. *Id.*
at 599. Cook argued that *Marshall* did not apply because this
identification was worse than suggestive—it was unreliable.
The state appellate court thought that the state supreme

court embraced that distinction in May 2006, four months after the conclusion of Cook's trial (January 2006). *State v. Hibl*, 714 N.W.2d 194, 201–05 (Wis. 2006) (clarifying that even for spontaneous identifications, courts should exclude unduly prejudicial identifications). (Whether *Hibl* simply clarified state law or introduced a new limitation is an interesting question, but not one that we need to resolve.)

Langan's performance in these respects was far from ideal. Had this been the only flaw, we would have a different case, but as is clear by now, it was not. In one respect, however, we find nothing to criticize: although the trial court could have, and probably would have, ordered the jury to disregard Harper's identification as unduly prejudicial if Langan had made a proper motion, it is unclear whether his failure to do so made any difference under then-prevailing state law. See *Marshall*, 284 N.W.2d at 599. More importantly, as we noted earlier, Langan did attempt to impeach Harper in other ways.

Cook also argues that the identification was so unreliable that any competent attorney would have argued that it violated due process. Courts have addressed due-process concerns with in-court identifications, particularly where, as here, the defendant is the only person of his race in the courtroom and is seated at the defense table. See, *e.g.*, *Lee v. Foster*, 750 F.3d 687, 691 (7th Cir. 2014). But at the time of trial, only a handful of cases would have supported a due-process objection. This is not enough. See *Richter*, 562 U.S. at 110 (counsel not deficient for lack of foresight or failing to prepare for remote possibilities).

    5. Withdrawal of question to Sadowski about Hall's possession of a gun immediately before the crimes

At one point, Langan was attempting to establish the fact that Hall was carrying a gun on the night of the home invasion. When Sadowski was on the stand, he asked her whether she saw Hall with a gun that night. While his words were still hanging in the air, the prosecutor objected to the question. Without missing a beat, and without giving the court a chance to rule on the objection, Langan withdrew the question. The judge later indicated (at the post-conviction hearing) that he would have overruled the state's objection and allowed Langan to proceed. Post-conviction counsel was able to get Sadowski to admit that Hall frequently carried a gun similar to the one used in the crimes. We can think of no strategic reason why Langan would have wanted to fold so quickly, and so we regard this as another instance of deficient performance.

6. Failure to object to testimony that Cook temporarily discontinued his interrogation by police

Detective Baldwin testified that after Cook initially waived his *Miranda* rights, he identified Egerson from a photo while saying that he had not been in town that day. Baldwin then stated that the officers then asked Cook if he wanted to give a written statement but Cook declined and "indicated that he didn't want to talk anymore." Langan did not object to the latter testimony nor to the introduction of a signed statement form with "refused" written on it. Although the form was introduced as an exhibit, the jury never saw it.

The detectives interviewed Cook again the next day. After again waiving his *Miranda* rights, Cook admitted that he was in the area with Egerson on the night of the robbery. According to Cook, the two went to Babic's house for a few

hours before returning to Milwaukee. Langan himself elicited the testimony that Cook again invoked his right to silence at the end of the second interview.

We see nothing worth pursuing in these events. Cook contends that the state appellate court unreasonably determined that he did not invoke his Fifth Amendment right against self-incrimination and unreasonably applied *Strickland* when it ruled that he was not prejudiced by Langan's failure to object to this part of Baldwin's testimony. But Langan's failure to object to the detective's testimony was not deficient. Even though *Doyle v. Ohio*, 426 U.S. 610, 619 (1976), holds that silence following *Miranda* warnings may not be used to impeach a defendant's testimony at trial, it does not bar all testimony about a defendant's silence. See *Anderson v. Charles*, 447 U.S. 404, 408–09 (1980) (questions about post-*Miranda* silence permissible to "elicit an explanation for a prior inconsistent statement"). Whether questions about a defendant's post-*Miranda* silence violate due process depends on "the particular use to which the post-arrest silence is being put." *Lindgren v. Lane*, 925 F.2d 198, 202 (7th Cir. 1991).

The state appellate court reasonably found that the prosecution here did not improperly use Cook's silence as evidence of his guilt or to impeach him. See *Bieghler v. McBride*, 389 F.3d 701, 705, 707 (7th Cir. 2004). The state did not focus on this aspect of Baldwin's testimony. Cook's termination of questioning during his first interview came up only as part of his summary of the sequence of events in the investigation leading up to Cook's admissions. See *Splunge v. Parke*, 160 F.3d 369, 371–73 (7th Cir. 1998) (testimony on defendant's silence did not violate due process where prosecutor men-

tioned silence in sequence of events as a "prologue" to the introduction of statements defendant did make). Counsel was not deficient for failing to object to this testimony.

B

Before turning to the question of prejudice, we add a few facts that came out at the postconviction evidentiary hearing. They shed additional light on Langan's performance.

Sadowski testified that she and Hall had heard a rumor that the Harpers had a large amount of marijuana in their garage. Based on that rumor, she and Hall had scoped out the garage a few times with an ex-boyfriend of the Harpers' daughter. Although she claimed not to have seen Hall with a gun on the night of the robbery, Sadowski admitted that Hall had his gun on him "a lot" and it "[c]ould have been" the same type of gun as the one used in the robbery.

The court also heard evidence from the state and Hall himself about Hall's whereabouts at the time of Cook's trial. The state established that Hall was then on parole but in "absconder status" after failing to show up for an appointment with his parole officer; a warrant was also out for his arrest. Hall's parole officer had tried to conduct a home visit, but Hall's roommates reported that he had been kicked out. Hall (who was brought in from prison for the hearing) testified that he had been living and working at his usual locations and that he would have complied with a subpoena to testify at Cook's trial. He also admitted to stopping by Babic's the night of the robbery but denied any involvement in the crime; he further denied having a gun that night or previously casing the Harpers' garage.

Finally, Langan testified. He could not remember why he did not question Babic on immunity or concessions in front of the jury, saying only that perhaps he "forgot" to do so. He explained that he did not request an accomplice jury instruction—which would have told the jury to consider the women's testimony with "caution and great care"—because he was satisfied with the general instruction about witness credibility. He also testified that he knew that the state did not disclose a witness who could authenticate Cook's cellphone records. But he did not object to the detective's testimony about Cook's cellphone being used the night of the robbery because he had reviewed the records and believed they were authentic and because he did not want to bog down the jury with cumulative evidence. The court stated that it thought it would have sustained an objection, had Langan made one, and that the state could not have "gotten that testimony in front of the jury if [counsel] had been doing his job."

## IV

Although we (along with the state appellate court) have found a number of examples of deficient performance, that is not enough to win the day for Cook. He can prevail only if he shows both substandard performance and prejudice. We must now ascertain whether the state court unreasonably concluded that Cook was not prejudiced by his lawyer's failings. In conducting that inquiry, we bear in mind that federal review of a state court's application of *Strickland* is "doubly deferential": the federal court must give first the defense attorney and then the last state court to rule on the matter "the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013).

Rather than ask how prejudicial each individual error was, we evaluate Langan's performance as a whole, or as Cook has put it, we consider the cumulative effect of counsel's errors. See *Goodman v. Bertrand*, 467 F.3d 1022, 1030 (7th Cir. 2006). For this purpose, we set aside any alleged error for which Langan's performance did not fall below the constitutional minimum; we look only at the question whether areas in which his performance was deficient, taken as a whole, led to a reasonable probability of a different result.

Particularly bearing in mind some of the critical factual misapprehensions (perhaps triggered by the state's overstatements in its briefs) that the state appellate court had, we find (as did the experienced state trial judge) that counsel's performance, taken as a whole, undermines our confidence in the outcome of Cook's trial.

We rely in particular on three significant errors: (1) Langan's failure to investigate Hall's location; (2) his failure to question Babic about immunity; and (3) his failure to object to or otherwise seek to exclude the hearsay testimony about the location and use of Cook's cellphone. Taken together, these instances of deficient performance undermined the trial judge's confidence in the result of the trial, and as an objective matter we come to the same conclusion. See, *e.g.*, *Goodman*, 467 F.3d at 1030 (counsel's failure to subpoena important defense witness because he thought the state would, was prejudicial when combined with "catalog" of other errors).

In deciding whether there is a reasonable probability that the errors changed the outcome of the trial, the court must consider all of the evidence. Logically, a verdict weakly supported by the record is more likely to have been affected by

errors than one with overwhelming record support. See *Blackmon v. Williams*, 823 F.3d 1088, 1105 (7th Cir. 2016). We recognize that even at a hypothetical trial where counsel did not make these errors, the jury would have learned of Cook's limited admissions and would have heard Babic and Sadowski implicate him in the robbery. But the jury would *not* have learned that Cook's phone was used to call Egerson's immediately after the robbery from a location near the Harpers' home. That evidence not only independently linked Cook to the robbery; it also corroborated the women's identification of him as a participant. Further, the state's case relied almost entirely on Babic and Sadowski's testimony, yet counsel failed to pursue an important opportunity to impeach Babic with her *de facto* immunity. He compounded that error by failing to ask for instructions specifically undermining the value of both women's testimony. If the jury found the women not credible and the cellphone testimony were excluded, the state's evidence would have been reduced to Cook's admission that he was with the women and Egerson that night. But so was Hall. And had counsel taken reasonable steps to find Hall, the testimony at the post-conviction hearing indicates he would have succeeded, and Hall would have complied with a trial subpoena. The jury—and Margaret Harper, for that matter—would have seen Hall, assessed his credibility, and heard his testimony, which conflicted in some respects with Sadowski's. Most importantly, the possibility that a different man was Egerson's accomplice would have been a concrete reality for the jury, not just talk.

To establish prejudice, Cook did not need to prove "that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at 693. Instead, he

had to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. We conclude that the state appellate court unreasonably applied that standard when it concluded that the result in Cook's case could stand, despite counsel's subpar performance.

We therefore REVERSE the judgment of the district court and order that Cook's petition for a writ of habeas corpus be granted, subject to the state's right to decide, within 120 days, whether to proceed with a new trial.