In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 21-1761

RICKY J. THURSTON,

*Petitioner-Appellant,*

*v.*

FRANK VANIHEL,

*Respondent-Appellee.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 18-cv-00525 — **James R. Sweeney II**, *Judge.*

———————————

ARGUED MAY 19, 2022 — DECIDED JULY 13, 2022

———————————

Before FLAUM, EASTERBROOK, and SCUDDER, *Circuit Judges.*

FLAUM, *Circuit Judge.* Indiana prosecutors charged petitioner-appellant Ricky Thurston with felony rape after his DNA was matched to cigarette butts found in the park that was the scene of the crime. He was convicted following a jury trial. In this appeal from the denial of his 28 U.S.C. § 2254 habeas petition, Thurston argues that he received ineffective assistance of counsel. Specifically, his attorney did not object to the admission of a report summarizing the DNA analysis of

the cigarettes because the defense attorney did not notice that the report also identified Thurston's DNA as matching a "sperm fraction" collected in "case IP06051889"—another rape for which Thurston was charged. The Indiana Court of Appeals affirmed his conviction, reasoning that the reference to the sperm fraction was "too vague" to "support the forbidden [propensity] inference." Because that decision was not an "unreasonable application of" the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), under 28 U.S.C. § 2254(d), we affirm the district court's order denying his petition for a writ of habeas corpus.

## I.   Background

### A.  The Underlying Offense and Investigation

On October 19, 2006, the victim, T.K., was thirty-nine years old. T.K. spent the day caring for her teenage daughter's infant son. Later that evening, after her family returned home, T.K. began drinking whiskey and got into a heated argument with her husband and daughter over the childcare arrangement. In the midst of that argument, T.K. realized that she was out of cigarettes. She asked her husband for the car keys so that she could drive to a nearby service station and buy more, but T.K.'s husband refused to give them to her because she had been drinking. Although it was around midnight, T.K. began walking to the service station, taking her half-pint bottle of whiskey with her. T.K.'s husband followed her for some distance, trying to convince her to return, but to no avail. T.K.'s husband returned to the house, and T.K. walked approximately four blocks to the service station and purchased cigarettes.

As T.K. was walking back, she saw a silver car drive past her, stop, turn around, and then drive back to her. The driver and sole occupant of the vehicle asked her if she wanted a ride. Although she was close to home, T.K. got in the car.

The driver said his name was Troy, that he was twenty-six years old, and that he worked in construction. T.K. later told police that he was Caucasian, had brown hair, and had a tear-drop tattoo under his eye. T.K. and the man drove around and talked for a while, smoking cigarettes and drinking from the half-pint of whiskey. When they ran out of whiskey, the man drove to a nearby house, which he told T.K. belonged to his employer. T.K. waited in the car while the man ran into the house and came back with a six-pack of beer. He then drove T.K. to a park and stopped the vehicle, where they continued to smoke, drink, and talk. The man drank five of the beers, while T.K. had one.

At some point, T.K. became tired and wanted to go home. When T.K. turned to ask the man to take her home, she saw that he had pulled his penis out of his pants and was masturbating. T.K. immediately demanded to be taken home, and the man stated that he wanted to have sex. T.K. said no and again asked to be taken home. The man then reached across T.K. and pulled a handgun out of the glove compartment. The man pressed the muzzle of the gun to the side of T.K.'s head and forced her to remove her pants. T.K., who was experiencing symptoms of premature menopause including heavy menstrual bleeding, cramping, and pain, told the man that she was having menstrual problems in hopes that it would discourage him from continuing. In response, the man ordered T.K. to remove her tampon and throw it out of the vehicle. T.K. complied, and then climbed on top of the man and

submitted to vaginal intercourse while he continued to hold the gun to her head.

When he finished, the man put the gun back into the glove compartment and got out of the vehicle to urinate. When the man walked out of T.K.'s line of sight, she ran from the vehicle and climbed a fence into the backyard of a nearby house, where she hid behind a picnic table. T.K. watched as the man returned to the vehicle and called her name, then drove away. T.K. then went to the house and knocked on the door. When the homeowner answered the door, T.K. asked her to call 911 because she had been raped. The 911 call was placed at approximately 7:00 AM.

Police responded, and an ambulance took T.K. to the hospital, where a forensic nurse completed a rape kit. The nurse also noted that T.K. sustained scratches on her hands and bruising on her right lower extremity, her left wrist, and on her inner thigh on both sides—injuries consistent with climbing over a fence.

Later that morning, Indianapolis Police Detective Richard Burkhardt interviewed T.K. T.K. took Burkhardt to the park, where crime scene investigators recovered five beer cans and several cigarette butts from one side of the narrow park, and one beer can and a soiled tampon from the other. T.K. was unable to identify the house where the man had stopped to get beer.

Forensic analysis of the samples taken from T.K.'s body and clothing did not disclose the presence of seminal material, and the case went dormant for approximately four years until DNA analysis was finally performed on the cigarette butts. The unknown partial male DNA profile found on the

cigarettes matched an existing unknown male DNA profile from another open rape case in Marion County, case IP06051889 ("case -889"). The DNA results from the cigarette butts were uploaded to a statewide database and, a year later, were found to match Thurston's DNA after he was arrested on an unrelated matter.

After the DNA in T.K.'s case was matched to Thurston, Thurston waived his rights and participated in a custodial interview with the police. He told them that in 2006 he was living and working with his boss, and he provided an address in the neighborhood T.K. had identified. He also admitted that he used his boss's Thunderbird at the time, which matched the description of the vehicle T.K. had given. He denied having ever been to the park. Thurston also denied recognizing T.K. when he was shown a photo of her taken shortly after the rape. Similarly, when the detective later showed T.K. a photo of Thurston in a six-photo array, she could not identify him.

### B. State Court Trial Proceedings

Prosecutors charged Thurston with rape[1] in 2011, and he went to trial in February 2012. Before trial, the court granted Thurston's motion *in limine* precluding the State and its witnesses from referencing Thurston's previous convictions, pending charges under investigation, or criminal offenses not yet reduced to conviction—including the "-889" rape case.

Before the jury heard evidence, the judge instructed the jurors that they could ask questions and explained, "You

---

[1] Ind. Code § 35-42-4-1. Thurston was also charged with and convicted of criminal confinement, but during sentencing the trial judge merged those convictions.

must put your questions in writing. I will review them with the attorneys, and I will determine whether your questions are permitted by law. If a question is permitted, I will ask it of the witness. If it is not permitted, you may not speculate as to why it was not asked, or what the answer may have been." The court also instructed the jury that "[a] defendant must not be convicted on suspicion or speculation," and that any verdict must be "based upon what you hear and see in this court."

At trial, Thurston did not challenge the DNA evidence that placed him at the park with T.K. Instead, his defense was that "whatever happened" between him and T.K. was consensual. Thurston's defense attorney argued that T.K. alleged a rape occurred because she could not otherwise explain to her husband where she had been for seven hours.

During the testimony of Shelly Crispin, a serologist and DNA analyst with the Indianapolis Marion County Forensic Services Agency ("IMCFSA"), the trial court admitted State's Exhibit 16 into evidence. Exhibit 16 was a report summarizing the DNA testing performed on the cigarette butts from the park. The report stated that one collected cigarette filter, identified as "item 003.001," had DNA from an unknown male major DNA contributor, as well as a minor contributor with an "inconclusive" DNA profile. In addition, the report noted:

> The partial DNA profile from the major contributor of item(s) 003.001 was entered into the IMCFSA DNA Database and was found to be consistent with an unknown partial male profile from the sperm fraction of item(s) 3.5.1 from case IP06051889. The partial DNA profile from the major contributor of item(s) 003.001 was

> entered into the Indiana DNA database and is
> being maintained on file for future searches.

Thurston's attorney did not notice this reference to case -889, and he did not object when the exhibit was admitted or when it was published to the jury.

At the conclusion of Crispin's testimony, two jurors submitted questions about the reference to the sperm fraction. Juror 5 asked: "Is it fair to say that since the DNA from item 003.001 matched Ricky Thurston's profile, the partial male profile from the sperm fraction of item(s) 3.5.1 from case IP06051889 (referenced in state's exhibit 16 paragraph 2 of conclusions) is also that of Ricky Thurston?" Juror 12 asked: "How does a person get into the State database? What is case IP06051889?" The trial judge ruled that neither question would be asked.

On appeal to this Court, Thurston emphasizes that all of the trial exhibits consisting of evidence collected during the Indianapolis police officers' investigation of T.K.'s case were marked with the "IP" number corresponding to the instant case—IP06109685—such that the jury could infer that the -889 case number also related to a criminal investigation. Additionally, Thurston underscores, Crispin and the prosecutor referred to her lab as the "crime lab" repeatedly.

During a break in the testimony after Crispin had been excused, Thurston's attorney argued that Exhibit 16 should not be sent back to the jury during deliberations, or that it should be redacted. The judge rejected the argument for redaction, stating: "The jury's seen this. They had it. We can't redact it now. It's either going back or it's not going back." Ultimately, the judge overruled the defense's objection and sent Exhibit

16 to the jury unredacted. After confirming that item 3.5.1 was not referenced anywhere else, the judge reasoned:

> I mean, the conclusions the jury could draw would be myriad.… I'll note your objection, but I think there are too many different scenarios the jury could draw, other than concluding it's a different rape case that's pending, which is something we [the judge, prosecutors, and defense counsel] all know.

Following this ruling, Thurston's attorney moved for a mistrial, saying, "I think allowing that in represents ineffectiveness on my part." The judge denied the mistrial motion.

In addition to Crispin's testimony, the State presented the video of Thurston's interview with the police (with all references to other cases omitted). T.K., T.K.'s husband, Detective Burkhardt, a nurse, and other police investigators also testified.

On appeal, as at trial, Thurston points out several inconsistencies in the State's evidence. For instance, T.K. testified that she left her house in jeans, but Detective Burkhardt stated that she was in sweatpants when he interviewed her at the hospital, and she had not changed since calling 911. Crispin also testified that forensic analysis was performed on T.K.'s "sweatpants." Juror 12, who asked about case -889, caught the discrepancy and submitted the question: "[T.K.] left her home wearing jeans but arrived at the hospital wearing sweatpants, what happened?" The judge did not ask that question, either.

T.K. also denied sharing any cigarettes with Thurston, but the DNA evidence from some cigarette butts showed her DNA present alongside the DNA of a male minor contributor,

and Thurston could not be excluded as the minor contributor. Additionally, T.K. testified at trial that Thurston went behind his vehicle to urinate, whereas in her deposition, T.K. had testified that she "couldn't see him, so he must have went like way back like where the woods were to pee." Thurston's counsel impeached T.K. with this inconsistency at trial. Thurston's attorney also confronted T.K. about the color of the gun Thurston supposedly used. Originally, T.K. told Detective Burkhardt that the gun was silver. Then at trial, she testified that she was sure it was black. Then, after being confronted by her deposition testimony, she said that it was black and silver.

In his closing argument, Thurston's attorney argued that T.K. lied about being raped. He argued that she did not need a ride home because she was almost there; instead, she consensually spent seven hours with Thurston. He highlighted the inconsistencies in T.K.'s statements. And he emphasized that there was "no evidence" that T.K. and Thurston even had intercourse, let alone that she was raped.

Before the jury began deliberating, the trial court again instructed the jury and, as part of the post-trial instructions, reiterated the preliminary instructions against speculation. During deliberations, the jury asked another question:

> We feel that the jury instructions under 6 and 14 give contradictory instructions in this case. This perceived contradiction is leading to an impasse in our deliberation. Do you have any advice in how to overcome the impasse?

Instruction 6 pertained to the defendant's presumption of innocence and explained that Thurston was not required to

present any evidence. Instruction 14 pertained to the State's burden of proof and elaborated on the concept of reasonable doubt. With the parties' agreement, the trial court replied to the question by informing the jury that the instructions were pattern instructions that should be reread along with all the instructions and that the jury should seek a verdict based upon its collective memory of the evidence.

The jury found Thurston guilty. The trial court determined that Thurston was a habitual offender after conducting a bench trial on that question, and it sentenced him to fifty-five years' incarceration.

## C.  Collateral Review Proceedings

Thurston first pursued a direct appeal on issues that are not relevant to his habeas claims. *See Thurston v. State* (*Thurston I*), 982 N.E.2d 31, 2013 WL 297772 (Ind. Ct. App. 2013) (unpublished table decision). After his convictions were affirmed on direct review, he sought post-conviction relief in state court.

Thurston argued that he had been denied effective assistance of counsel at trial. *See Strickland*, 466 U.S. at 687. Specifically, he claimed that his trial counsel had been ineffective for failing to notice the reference to case -889 in Exhibit 16, failing to prevent its admission into evidence at trial, and failing to mitigate the damage caused by its admission. Thurston's trial attorney submitted an affidavit supporting the *Strickland* claim, which stated that the attorney received Exhibit 16 during discovery and "didn't notice the reference to [case -889] … until after the judge admitted the report into evidence and two jurors submitted questions to Crispin inquiring about the second case number." The attorney also

averred that he did not make a tactical decision to forego an objection, request for redaction, or jury admonishment related to Exhibit 16.

The trial court denied relief, and the Indiana Court of Appeals affirmed. The Court of Appeals did not evaluate the trial attorney's performance; instead, it held that Thurston could not meet his burden of showing prejudice under *Strickland*. It stated:

> We acknowledge that a reference to a sperm fraction has the potential to be more problematic in a rape case than it might in a case where another type of offense, such as a property or financial crime, is alleged. However, in this case, the nature of a "sperm fraction" or how Thurston's sperm fraction may have been obtained by the State was not elaborated upon or explained to the jury. There was no evidence before the jury as to the nature of case -889 or Thurston's role in that case, let alone that he was a suspect. As such, while the reference to case -889 may have permitted an inference of prior misconduct, it was too vague as to the nature of any prior criminal activity to support the forbidden inference that Thurston must have raped T.K. because he had been accused of raping another.

*Thurston v. State* (*Thurston II*), 110 N.E.3d 1185, 2018 WL 4003363, at *5 (Ind. Ct. App. 2018) (unpublished table decision). The Court of Appeals also found that the jury instructions "undermined" Thurston's claim of prejudice. *Id.* It noted:

> Although the jury asked questions about the reference to case -889 contained in Exhibit 16, the trial court did not pose those questions to Crispin, and the jury had been instructed that it was not to speculate why any of its questions had gone unasked or what the answers to its questions might have been. The jury was reminded of these directives as part of the trial court's final instructions, and the trial court further instructed the jury to base its verdict on the facts and the law, not on sympathy or bias. A jury is presumed to follow a trial court's instructions. Thurston's speculation as to what the jury could have concluded from the reference to case -889 and his attempts to draw conclusions from the jury's impasse question do not overcome the presumption that the jury followed the trial court's instructions to base its verdict only on the evidence presented at trial and not upon speculation about its unanswered questions.

*Id.* (citations omitted). The appellate court also found that T.K.'s version of events was corroborated by her injuries consistent with climbing a fence. *Id.* at *6. It also highlighted evidence that undercut Thurston's defense: He initially claimed that he had never been to the park where his DNA was recovered, and he initially claimed not to recognize T.K.'s photo. *Id.* Overall, the appellate court concluded, "[g]iven the vagueness of the isolated reference at issue, the trial court's instructions to the jury, and the other evidence presented at trial, our confidence in the jury's verdict is not undermined." *Id.* The Indiana Supreme Court denied review.

Thurston next filed a habeas petition in federal court pursuant to 28 U.S.C. § 2254, raising the same ineffective assistance claim. The district court denied the petition, holding that the Indiana Court of Appeals' decision did not "involve[] an unreasonable application of" *Strickland*. *See* 28 U.S.C. § 2254(d). Nonetheless, it acknowledged that "whether the mention of case -889 prejudiced Thurston is a close call" and issued a certificate of appealability. Thurston now appeals.

## II.    Discussion

We review a district court's ruling on a petition for habeas relief de novo. *Brown v. Brown*, 847 F.3d 502, 506 (7th Cir. 2017). If the federal district court made findings of fact, we review those for clear error. *Id.*

When a habeas petition challenges a state court conviction, "[o]ur review is governed (and greatly limited) by the Antiterrorism and Effective Death Penalty Act of 1996 ('AEDPA')." *Hicks v. Hepp*, 871 F.3d 513, 524 (7th Cir. 2017). "Under [AEDPA], a federal court is not authorized to issue a writ of habeas corpus on a claim rejected by a state court on the merits unless the state-court decision was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court,' or was 'based on an unreasonable determination of the facts.'" *Cook v. Foster*, 948 F.3d 896, 901 (7th Cir. 2020) (quoting 28 U.S.C. § 2254(d)). We "look to … the 'last reasoned state-court decision' to decide the merits of the case, even if the state's supreme court then denied discretionary review." *Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (en banc) (quoting *Johnson v. Williams*, 568 U.S. 289, 297 n.1 (2013)).

The applicable federal law in this instance is the Supreme Court's 1984 decision, *Strickland v. Washington*, 466 U.S. 668, which laid out the standard for obtaining relief for ineffective assistance of counsel. To prevail on an ineffective assistance of counsel claim, a defendant must show that (1) counsel's performance was deficient, and (2) the deficient performance was prejudicial such that it deprived the defendant of a fair trial. *Id.* at 687. To establish the requisite prejudice, Thurston must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Buck v. Davis*, 137 S. Ct. 759, 776 (2017) (quoting *Strickland*, 466 U.S. at 694). In other words, there must have been "a reasonable probability that, without [the reference to case -889], at least one juror would have harbored a reasonable doubt" about whether Thurston raped T.K. *Id.* Notably, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

If a petitioner "makes an insufficient showing on one" prong of the *Strickland* analysis, "there is no reason for a court … to address both components of the inquiry." *Strickland*, 466 U.S. at 697. Following this guidance, the Indiana Court of Appeals did not evaluate Thurston's attorney's performance; it began and ended its analysis by concluding that Thurston was unable to show prejudice. Accordingly, we ask whether that conclusion was a reasonable application of *Strickland*. We will find that a state court unreasonably applied federal law only if its decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

We start with the court's determination that the reference to case -889 was "too vague … to support the forbidden [propensity] inference." *Thurston II*, 2018 WL 4003363, at \*5. On Thurston's view, whether the reference to case -889 was "vague" is a determination of fact, which, in this Circuit, we will find unreasonable only if "the factual premise was incorrect by clear and convincing evidence." *Cook*, 948 F.3d at 901.[2] On the other hand, the State contends that a conclusion about the import of a fact under *Strickland* is more properly framed as a legal conclusion. *See Lopez v. Smith*, 574 U.S. 1, 8 (2014) (holding that a court's determination that a set of facts "failed to measure up to the [applicable legal] standard …. ranked as

---

[2] There are two provisions of AEDPA that govern review of a state court's factual findings, § 2254(d)(2) and § 2254(e)(1), but the Supreme Court has "not defined the precise relationship between [them.]" *See Burt v. Titlow*, 571 U.S. 12, 18 (2013). Section 2254(d)(2) provides that a reviewing court should consider whether the factfinding "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," whereas § 2254(e)(1) says that "a determination of a factual issue made by a State court shall be presumed to be correct [unless] [t]he applicant … rebut[s] the presumption of correctness by clear and convincing evidence." In our Circuit, we have decided that "§ 2254(e)(1) provides the mechanism for proving unreasonableness [under § 2254(d)(2)]," *see Ben-Yisrayl v. Buss*, 540 F.3d 542, 549 (7th Cir. 2008), although other circuits have taken different approaches, *see Hayes v. Sec'y, Fla. Dep't of Corr.*, 10 F.4th 1203, 1223 (11th Cir. 2021) (Newsom, J., concurring) (describing the circuit split on how to synthesize § 2254(d)(2) and § 2254(e)(1)). The reasonableness standard for reviewing legal challenges set forth in § 2254(d)(1) is arguably a "more petitioner-friendly standard" than the one we have adopted for reviewing factual challenges. *See Smith v. Dickhaut*, 836 F.3d 97, 101 (1st Cir. 2016) (comparing the "unreasonable determination" language in § 2254(d)(2) with "the more deferential standard in [§] 2254(e)(1)"). Under either standard, however, the result in this case is the same.

a legal determination governed by § 2254(d)(1), not one of fact governed by § 2254(d)(2)"). *Cf. Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir. 2009) (noting that "whether a contract is ambiguous is a question of law"). Nonetheless, "regardless if we classify [Thurston's] challenge as raising an issue of pure fact, pure law, or a mixed question of law and fact, we are required under the AEDPA to review the state court's adjudication on the merits of his claim deferentially and set the decision aside only if the court committed unreasonable error." *Ward v. Sternes*, 334 F.3d 696, 704 (7th Cir. 2003).

Returning to the substance of the opinion under review, the Indiana Court of Appeals was entitled to presume that the jury would not disobey its instructions and speculate about the reference to case -889. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions."); *Bruton v. United States*, 391 U.S. 123, 135 (1968) (recognizing that "[i]t is not unreasonable to conclude that … the jury can and will follow the trial judge's instructions to disregard [inadmissible evidence]"). Furthermore, it was not unreasonable for the Indiana Court of Appeals to decide that it would require forbidden speculation—not permissible inference—to make the jump from the reference to a "sperm fraction" in case -889 to the prejudicial conclusion that Thurston was the suspect in another rape case. Thurston emphasizes that Crispin testified that she worked in the "crime lab," and he points out that the format of the IP06051889 case number matched the format of the IP06109685 number assigned to evidence collected to investigate T.K.'s case. But Juror 12 asked, "How does a person get into the state database?" and that question was never answered. Nor was there any additional mention of case -889 in any witness testimony or closing argument. We

therefore defer to the Indiana appellate court's ruling that the case -889 reference was "too vague."

Thurston goes on to argue that the Indiana Court of Appeals unreasonably applied federal law because it did not "consider all the evidence—the good and the bad—when evaluating prejudice." *See Wong v. Belmontes*, 558 U.S. 15, 26 (2009). On Thurston's view, the Indiana Court of Appeals did not appreciate that his conviction "depended entirely on the credibility of T.K." Thurston points to the jury's impasse note as evidence that it was a close case, and he reads the appellate court opinion as considering "*only* the evidence corroborating [T.K.'s] account." Not so.

First, as the Indiana Court of Appeals highlighted, the case did not boil down to a pure credibility contest because there was corroborating evidence that "T.K. sustained documented injuries climbing over a fence fleeing from Thurston, which was inconsistent with Thurston's theory of the case that T.K. consented to having sex with him." *Thurston II*, 2018 WL 4003363, at *6. If anything, the Indiana Court of Appeals omitted mention of additional evidence substantiating T.K.'s account. The opinion did not discuss, for example, the soiled tampon, corroborating that the two had intercourse; the quantity of menstrual blood found during the forensic examination, corroborating T.K.'s medical condition that made sex painful and undesirable; or the distribution of beer cans in the park, five on one side, one on the other, corroborating how much T.K. said each person drank.

Moreover, the Indiana Court of Appeals expressly acknowledged the weakness of the State's case. It reasoned that, "[a]lthough [the State's] evidence [wa]s not overwhelming, neither was the reference [to case -889] at issue here." *Id.*

And after acknowledging the "not overwhelming" nature of the prosecution's evidence, the Court of Appeals explicitly weighed "the vagueness of the isolated reference at issue, the trial court's instructions to the jury, and the other evidence presented at trial," before concluding that its "confidence in the jury's verdict [wa]s not undermined." *Id.* Contrary to Thurston's position, the opinion shows that the Indiana Court of Appeals engaged in the holistic review envisioned in *Wong*, 558 U.S. at 26.

In summary, we conclude that the decision of the Indiana Court of Appeals holding that Thurston did not meet the demanding standard for establishing "prejudice" under *Strickland* was not unreasonable.

### III.    Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court denying Thurston's petition for habeas relief under 28 U.S.C. § 2254.