In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-1168

LARRY H. DUNN, JR.,

*Petitioner-Appellee,*

*v.*

CATHY JESS,

*Respondent-Appellant.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 18-cv-700 — **William C. Griesbach**, *Judge.*

ARGUED SEPTEMBER 23, 2020 — DECIDED NOVEMBER 24, 2020

Before SYKES, *Chief Judge*, and HAMILTON and ST. EVE, *Circuit Judges*.

ST. EVE, *Circuit Judge*. Larry Dunn slapped Andrew Schuckman in a bar's parking lot, causing him to fall to the ground. Witnesses reported seeing Schuckman upright and apparently unharmed afterward, but hours later, he was found dead on the bar's back patio. The state charged Dunn and his friend Michael Crochet with felony murder, battery, and theft from a corpse for stealing Schuckman's cell phone.

A key issue in the case was whether Dunn's slap caused Schuckman's death. In preparation for trial, Dunn's counsel consulted with a forensic pathologist. After viewing the medical examiner's report, the pathologist believed that Schuckman died immediately from his head injuries—suggesting that Dunn's slap could not have caused his death. In the months leading up to trial, defense counsel repeatedly—and erroneously—stated that he believed the medical examiner had concluded that Schuckman died immediately from a fatal blow to the back of his head and would testify to that at trial. Dunn's counsel expressed this belief even though the medical examiner's report did not contain these conclusions about the immediacy of death and he never confirmed them with her in advance of trial. Shortly before trial, the prosecutor informed Dunn's counsel that Crochet, Dunn's co-defendant, had disclosed that he had retained experts for his case. These experts were going to produce reports containing information that bolstered Dunn's no-causation defense; the prosecution considered these reports to be exculpatory. Trial counsel did not ask for a continuance or attempt to view the reports' contents, stating that the medical examiner would testify to the immediacy of death. At trial, defense counsel did not call his forensic pathologist as a witness. Furthermore, contrary to Dunn's counsel's expectations, the medical examiner testified that there was no reason to think that Schuckman would have died immediately from the fatal head injury, and it would have been possible for Schuckman to move after sustaining this injury.

In state postconviction proceedings, Dunn asserted that his trial counsel had been ineffective for failing to investigate and present evidence that supported a no-causation defense to felony murder. The state appellate court concluded that

Dunn's trial counsel did not perform deficiently. Dunn then filed a habeas petition in federal court, which the district court granted. It reasoned that Dunn's trial counsel provided ineffective assistance by failing to investigate and offer evidence to support a no-causation defense. Federal courts "do not lightly grant petitions for a writ of habeas corpus brought by state prisoners," and "if the 'standard [for relief] is difficult to meet, that is because it was meant to be.'" *Cook v. Foster*, 948 F.3d 896, 899 (7th Cir. 2020) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)). Here, we agree with the district court that Dunn has met this high bar—he is entitled to relief because he was prejudiced by his trial counsel's deficient performance. We therefore affirm.

## I. Background

### A. Andrew Schuckman's Death

On May 9, 2011, Schuckman, Dunn, and Crochet were patrons of Peg & Lou's Bar in Racine, Wisconsin. Dunn and Crochet were in town on business and they went to the bar with Crochet's uncle, Fred Tennessen. Schuckman was intoxicated and had several unwelcome interactions in the bar with Crochet and other bar patrons. The bartender eventually asked Schuckman to leave and escorted him outside. Dunn and Crochet later encountered Schuckman in the bar's parking lot. Dunn slapped Schuckman with his open left hand, which caused Schuckman to fall to the ground and hit his head. Dunn then went inside and told the bartender what had happened and asked him to go check on Schuckman. When the bartender did not immediately do so, Dunn returned outside to check on Schuckman. After about ten to fifteen minutes, the bartender arrived and told Dunn to go back inside. The

bartender escorted Schuckman to the bar's back patio and left him on the grass next to a chair.

Hours later, in the early morning of May 10, a bar patron discovered Schuckman's body about five to six feet from where the bartender had left him. He was lying face up, and there was blood underneath his head and coming from his mouth and nose. His shirt was pulled up, and his pants were pulled down slightly. Several personal items, including his credit cards and wallet, lay near his body.

**B. Dunn's Trial**

At trial, Dunn's defense counsel advanced two key reasons why the jury should find Dunn not guilty—self-defense and a lack of causation. Dunn testified that he slapped Schuckman in self-defense because Schuckman approached him and Crochet with his fist raised. Trial counsel also argued that the state had failed to show that Dunn's slap caused Schuckman's death.

The state put on several witnesses, including bar patrons, the bartender, an investigator, a DNA analyst, and the medical examiner. The bartender testified that when he went outside to check on Schuckman, he was sitting on the ground and had no physical marks on him. Schuckman seemed a little dazed, but mostly seemed intoxicated. He helped Schuckman stand up and then used his arms to help Schuckman walk to the back patio. A bar patron corroborated this testimony, testifying that he saw the bartender talking to Schuckman in the parking lot and that Schuckman was breathing and seemed "fine as far as [the bar patron] could see." The patron also saw the bartender help Schuckman stand up.

Another bar patron testified that he saw Dunn, Crochet, and Tennessen leave the bar about ten to fifteen minutes before him. When he exited the bar, Dunn was inside a pickup truck and another person—either Crochet or Tennessen—walked to the truck from the direction of the bar's back patio.

The medical examiner, Dr. Linda Biedryzycki, testified that Schuckman's cause of death was blunt head injury. He had at least five different points of impact on his head, the most severe of which was a skull fracture and laceration to the back of his head. According to Dr. Biedryzycki, all Schuckman's head injuries contributed to his death. She testified that the injury to the back of the head was consistent with someone striking the pavement or the ground. While she had no way of knowing definitively if the skull fracture caused instantaneous death, she opined that there was no reason to think it would because it did not affect his vital center. In her opinion, it was possible for someone to be able to move himself after that type of injury. She also testified that Schuckman's blood alcohol level was .298%, which would affect his motor skills.

A police investigator testified that a football-sized pool of blood lay under Schuckman's head, and based on debris on Schuckman, it appeared as though he had been dragged by his legs. He further testified that investigators found pieces of Schuckman's cell phone at the hotel where Crochet and Dunn were staying. The cell phone had been used after Schuckman died to call Dunn's girlfriend. A DNA analyst also testified; he reported that Crochet's pants had blood on them that matched Schuckman's DNA, but there was no similar positive DNA match in the stains on Dunn's clothing.

Dunn testified in his own defense. He explained that Schuckman had been intoxicated and acted aggressively toward him and his friends in the bar. At some point, he went outside to get cigarettes; Crochet followed soon after to get medicine out of the truck. When Crochet went into the truck, Schuckman approached in an agitated manner with his fist balled up over his head. Dunn then slapped Schuckman with his open left hand. After notifying the bartender about what had happened and checking on Schuckman, Dunn went back inside the bar and did not see Schuckman for the rest of the night. When the men got back to the hotel, Dunn's cell phone was dead. He grabbed what he thought was Crochet's phone off the dresser and called his girlfriend to say goodnight.

The jury found Dunn guilty of all three counts. The state court sentenced him to 10 years of imprisonment followed by 8 years of extended supervision.

### C. Postconviction Proceedings

Dunn filed a motion for postconviction relief in the state trial court, contending that his counsel was ineffective for failing to investigate and present evidence of a no-causation defense.[1] To succeed on this claim, under *Strickland v. Washington*, 466 U.S. 668 (1984), Dunn needed to show that his counsel's performance was deficient and that he was prejudiced as a result. The court held an evidentiary hearing. Dunn called two witnesses: his trial counsel and a forensic pathologist, Dr. Peter Stephens. The state called the medical examiner who had testified at trial, Dr. Biedryzycki.

---

[1] Dunn also argued he was entitled to relief on other grounds that are no longer at issue. Accordingly, we will not discuss them further.

Dunn's trial counsel testified that the cause of Schuck-man's death was an important issue in the case. He had consulted with a forensic pathologist, Dr. Robert Corliss, twice before trial in order understand the medical examiner's report on the cause of death. At the initial consultation, Dr. Corliss believed Schuckman had died immediately after receiving the head trauma based on the information in the medical examiner's report. Dunn's counsel erroneously believed that the medical examiner's report stated this conclusion. He memorialized this mistaken belief in two emails to the prosecutors, months apart, in which he stated that the medical examiner had concluded that Schuckman had died immediately from head trauma. He recognized, and pointed out to opposing counsel, that this fact undercut the state's theory of the case. The bartender had witnessed Schuckman seemingly unharmed after Dunn's slap, suggesting it could not have been the cause of Schuckman's death.

In the month leading up to trial, Dunn's counsel consulted with Dr. Corliss again. In that conversation, they focused on the fact that Schuckman sustained multiple head injuries, beyond what would be explained by Dunn's slap and Schuckman's fall. He planned to cross-examine the medical examiner on this point. At that time, Dunn's counsel was still operating under the erroneous belief that the medical examiner was going to testify that Schuckman's death was immediate from the fatal blow to the back of his head. He expressed this belief just ten days before trial in response to an email from the prosecutor. The prosecutor emailed him and stated that Crochet's attorney had retained a blood spatter expert and a pathologist, who were going to produce reports purportedly establishing that Schuckman had stood up in the area where he was found and then fell and hit his head. Dunn's trial

counsel did not follow up with the prosecutor or contact Cro-
chet's attorney to inquire about reports' contents. Rather, he
wrote back to the prosecutor an hour later, stating that:

> Our theory of defense has always been that Mr. Dunn
> slapped Mr. Schuckman in self-defense; that he didn't
> die immediately because people heard him talking,
> mumbling, grumbling after hitting the parking lot, and
> that the medical examiner will say he died immedi-
> ately. Therefore, there had to be a second time that his
> head hit the ground after Mr. Dunn's slap that caused
> death. I believe that the testimony of the medical ex-
> aminer, combined with the testimony of [the bar-
> tender], supports that there has to be another hit irre-
> spective of what [Crochet's attorney's] pathologist
> says.

Trial counsel did not speak with Dunn before sending this
email, though he testified that Dunn had been clear about not
wanting a continuance. He testified that he told Dunn about
the prosecutor's email sometime prior to trial.

The expert reports referenced in the email were completed
a week after Dunn's trial concluded. There were three expert
reports. First, a forensic pathologist wrote a report concluding
that Schuckman suffered non-fatal injuries in the parking lot
and he died due to injuries he received after falling backwards
on the bar's back patio. Second, a blood analyst concluded
that Schuckman was not bleeding in the parking lot and he
was never upright after sustaining the injury to the back of his
head. Third, a neurologist and mechanical engineer calcu-
lated that Schuckman could have generated enough velocity

falling backwards on the back patio to fracture his skull, and extreme intoxication can result in such an "unbroken" fall.[2]

Trial counsel stated that by the time Dunn's trial started, he understood that the medical examiner would not testify that death was immediate. Given his email to the prosecutor, this understanding must have occurred sometime in the ten days before trial. Dunn's counsel testified that he had no regret over not calling Dr. Corliss as a witness; he planned to draw out the fact that there were multiple injuries when cross-examining the medical examiner. He believed eliciting that testimony from a state's witness was more advantageous for his client than calling his own witness. He further testified that Dr. Corliss told him that the medical examiner's conclusions in the autopsy report were well-reasoned.

During the postconviction hearing, Dunn also presented the testimony of Dr. Stephens, a forensic pathologist. Dr. Stephens opined that the laceration and skull fracture in the back of Schuckman's head were the substantial cause of his death because he likely would have survived the other head injuries. He further opined that Schuckman sustained the skull fracture on the bar's back patio—not the parking lot where Dunn had slapped him. In reaching this conclusion, he relied on the nature of the injury and the lack of blood in the parking lot and on Schuckman's shirt. He testified that the nature of the impact causing the skull fracture would cause an immediate loss of consciousness, Schuckman would have been unlikely to be able to sit up and talk afterward, and he would

---

[2] The state later dismissed Crochet's felony murder charge and allowed him to plead guilty to aiding a felon and misdemeanor battery. He received a sentence of time served.

have died within a matter of minutes. Additionally, the amount of blood found underneath Schuckman's head and the lack of blood in the parking lot supported his conclusion that Schuckman received the skull fracture and laceration on the back patio. If Schuckman had lived longer than a few minutes, the pool of blood would have been bigger. Further, the laceration's size on the back of Schuckman's head indicates it had the potential to bleed significantly and profusely because the scalp is highly vascular. The wound would have bled immediately. So if Schuckman had sustained it in the parking lot, one would expect to find blood both there and on Schuckman's shirt because the bartender and bar patron saw Schuckman upright in the parking lot several minutes after Dunn slapped him. Thus, Dr. Stephens opined that Schuckman was never upright after sustaining the laceration and skull fracture, and so these injuries must have occurred on the back patio.

Dr. Biedryzycki testified for the state at the hearing. She opined that the laceration was relatively small and not gaping, so it may or may not have bled a lot. The nature of Schuckman's head injury did not lead her to assume that blood had to be present immediately after being injured. Further, she opined that the amount of blood under Schuckman's head could not be used to determine how long he lived after receiving the injuries because blood could have continued to pool around his head even after death due to hydrostatic pressure. She acknowledged that there was nothing in her autopsy report that was inconsistent with Schuckman sustaining the skull fracture and laceration on the back patio.

The trial court held that Dunn's ineffective assistance of counsel claim failed *Strickland*'s prejudice prong. The

Wisconsin Court of Appeals affirmed the denial of Dunn's postconviction motion. *State v. Dunn*, 372 Wis. 2d 458 (Wis. Ct. App. 2016) (per curiam). It "was not persuaded that trial counsel performed deficiently in his investigation of Schuckman's death and presentation of a no-causation defense." *Id.* ¶ 13. The state appellate court noted that Dunn's trial counsel consulted with a forensic pathologist. *Id.* It further determined that "trial counsel's testimony provides a reasonable explanation for his approach," because he had strategic and practical reasons for not calling Dr. Corliss as a witness. *Id.* ¶¶ 15–16. Strategically, he believed he could get the medical examiner to testify about the presence of multiple injuries on cross-examination, and practically, Dr. Corliss told counsel that he thought the medical examiner's report was well-reasoned. *Id.* ¶ 16. The state appellate court concluded that "[w]hile another lawyer may have handled the matter differently, that is not the standard for judging whether counsel's representation was incompetent." *Id.* The Wisconsin Court of Appeals did not reach *Strickland*'s prejudice prong.

Dunn then filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Eastern District of Wisconsin. The district court granted Dunn's habeas petition, concluding that he had received ineffective assistance of counsel. *Dunn v. Jess*, 430 F. Supp. 3d 568 (E.D. Wis. 2019). It reasoned that Dunn's counsel's investigation of Schuckman's death and of a no-cause defense was insufficient under any reasonable application of *Strickland*, because he failed to interview the medical examiner before trial, call a forensic pathologist, or investigate the exculpatory reports. Thus, the district court concluded that the state appellate court unreasonably applied *Strickland*'s performance prong.

Because the state appellate court did not address *Strickland*'s prejudice prong, the district court reviewed the prong de novo. The court concluded that "Dunn has demonstrated a reasonable probability that the result would have been different had Dunn's counsel adequately presented the no-causation defense and the jury heard expert testimony of the sort presented by Dr. Stephens." *Id.* at 579. Because Dr. Stephens's testimony "substantially undermines one's confidence in the result" of the trial, while "the jury may have reached the same conclusion even with such evidence," Dunn had provided sufficient evidence "to establish prejudice under *Strickland*." *Id.* at 580. The district court thus granted Dunn's habeas petition, and the state now asks us to reverse.

## II. Discussion

"Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court is not authorized to issue a writ of habeas corpus on a claim rejected by a state court on the merits unless the state-court decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court' or 'was based on an unreasonable determination of the facts.'" *Cook*, 948 F.3d at 901 (quoting 28 U.S.C. § 2254(d)). A state-court decision "unreasonably applies federal law if it correctly identifies the governing Supreme Court precedent but unreasonably applies its holding to the facts of the case." *Id.*

This standard "sets a high bar for state prisoners seeking federal habeas review." *Jones v. Calloway*, 842 F.3d 454, 460 (7th Cir. 2016). When a state court has reached an issue on the merits, the inquiry is not whether we "agree with the state court decision or even whether the state court decision was correct," it is "whether the decision was unreasonably wrong

under an objective standard." *Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (en banc). If the standard "is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102. "Nonetheless, 'difficult' does not mean 'impossible' … '[t]he writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law.'" *Cook*, 948 F.3d at 899 (quoting *Richter*, 562 U.S. at 91).

*Strickland* provides the clearly established federal law for Dunn's ineffective assistance of counsel claim. "A petitioner raising a *Strickland* claim is required to demonstrate two things." *Winfield v. Dorethy*, 956 F.3d 442, 451 (7th Cir. 2020). "First, he must show that counsel provided constitutionally deficient performance" and second, he must "show that this deficient performance prejudiced his defense." *Id.* at 451–52. "Failing to prove either element defeats a petitioner's claim." *Id.* at 452.

AEDPA deference only applies to issues that the last reasoned state court decision reached on the merits. Here, the Wisconsin Court of Appeals reached the question of whether Dunn satisfied *Strickland*'s performance prong. When the state court "'explains its decision on the merits in a reasoned opinion,' this presents a 'straightforward inquiry' for the federal habeas court." *Lentz v. Kennedy*, 967 F.3d 675, 688 (7th Cir. 2020) (quoting *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018)). "[W]e focus on that decision and 'simply review[] the specific reasons given by the state court and defer[] to those reasons if they are reasonable.'" *Id.* (quoting *Wilson*, 138 S. Ct. at 1192). Habeas relief is only warranted here if Dunn shows that the state appellate court's determination that his counsel did not perform deficiently "was so lacking in justification that there was an error well understood and comprehended in existing

law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. The Wisconsin Court of Appeals did not reach *Strickland*'s prejudice prong, and so the parties agree that AEDPA deference does not apply and we review that prong de novo.

**A. Deficient Performance**

"To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'" *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 688). This means a petitioner must identify errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* (quoting *Strickland*, 466 U.S. at 687). "To avoid the inevitable temptation to evaluate a lawyer's performance through the distorting lens of hindsight, *Strickland* establishes a deferential presumption that strategic judgments made by defense counsel are reasonable." *Mosley v. Atchison*, 689 F.3d 838, 848 (7th Cir. 2012). But for this deference to apply, the decision must be—in fact—strategic. "The consequences of inattention rather than reasoned strategic decisions are not entitled to the presumption of reasonableness." *Id.* (citing *Rompilla v. Beard*, 545 U.S. 374, 395–96 (2005)). We "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. Our review of the state court's decision is "'doubly deferential,' … [and] gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titles*, 571 U.S. 12, 15 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)).

The Wisconsin Court of Appeals concluded that Dunn's trial counsel did not perform deficiently in failing to

investigate and present a no-causation defense because he (1) consulted with a pathologist and (2) provided strategic and practical explanations for his approach. Upon closely examining the facts of this case, we find that the Wisconsin Court of Appeals unreasonably applied *Strickland* because Dunn's counsel was poorly informed and based his strategic decisions on a complete misunderstanding of a key piece of evidence—namely, the medical examiner's opinion on the immediacy of death.

It was unreasonable for the state appellate court to find that trial counsel did not perform deficiently because he consulted with a forensic pathologist. Indeed, at the initial consultation, Dr. Corliss provided trial counsel with a crucial piece of evidence supporting Dunn's no-causation defense: he thought Schuckman died immediately. Whether Dunn caused Schuckman's death was a critical issue in the case. The state's main theory of the case depended on connecting two events: Dunn slapping Schuckman in the bar's parking lot, and Schuckman being found dead hours later on the bar's back patio. Evidence that Schuckman would have died immediately after receiving his fatal head injuries would have lent strong support that these two events were not causally connected because multiple witnesses saw Schuckman alive, apparently unharmed, and upright after Dunn slapped him. Yet Dunn's counsel seemingly misattributed Dr. Corliss's opinion that death was immediate to the medical examiner, and erroneously believed that the medical examiner's report meant she would testify to that at trial. He failed to confirm that the medical examiner would introduce this key piece of evidence at trial or otherwise investigate the immediacy of death. His mistaken belief infected his trial strategy to such an extent that his approach to investigating and presenting a no-causation

defense cannot be reasonably viewed as strategic, even with
the "heavy measure of deference" afforded him under *Strickland*. 466 U.S. at 691. His "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment."
*Wiggins v. Smith*, 539 U.S. 510, 526 (2003). It is thus unreasonable to view trial counsel's decision to consult with a forensic
pathologist as satisfactory performance, considering trial
counsel did not use the crucial information gleaned from that
consultation.

It was also unreasonable for the state appellate court to
find that trial counsel's explanation for his approach contained reasonable strategic and practical reasons. Dunn's
counsel explained he did not call Dr. Corliss as a witness because he thought the evidence would be more persuasive if
elicited from the medical examiner on cross-examination. The
state appellate court found this explanation demonstrated
that trial counsel was acting strategically. This overlooks the
fact that trial counsel was not able to elicit a crucial piece of
evidence from the medical examiner on cross-examination:
that Schuckman died immediately. "A court adjudicating a
*Strickland* claim can't just label a decision 'strategic' and
thereby immunize it from constitutional scrutiny," and the
state court's determination that trial counsel was acting strategically here is not reasonable. *Jones*, 842 F.3d at 464. In fact,
his causation strategy was primarily based on the improbable
assumption that the state's medical examiner would testify
that the state's causation theory was medically impossible.
And when that unlikely strategy blew up, counsel had no
Plan B.

Trial counsel and the state appellate court seemingly view
the evidence about multiple injuries—which trial counsel was

able to elicit on cross-examination—as substitute evidence in support of a no-causation defense. But while evidence that Schuckman had more injuries than could be explained by the slap and fall lends some support to the theory that Dunn did not cause his death, it is not nearly as strong as evidence that Schuckman died immediately after the blunt force trauma to the back of his head. The medical examiner testified that all Schuckman's injuries contributed to his death. In order to convict for felony murder, the jury only needed to find that Dunn's conduct was a substantial factor in bringing about Schuckman's death. *See State v. Oimen*, 184 Wis. 2d 423, 404–05 (1994). So while the presence of multiple injuries suggests that Schuckman may also have been injured by someone or something other than Dunn, given the medical examiner's testimony that all the injuries contributed to his death, the jury could still reasonably find that the Dunn's slap was a substantial factor in his death. Evidence that Schuckman died immediately from one fatal blow, conversely, is much stronger evidence that Dunn did not cause his death. Multiple witnesses saw Schuckman alive, apparently unharmed, and standing several minutes after Dunn slapped him. Given this, trial counsel's explanation for not calling his forensic pathologist—that he could elicit the relevant information from the medical examiner on cross-examination—cannot be reasonably viewed as strategic. *See Washington v. Smith*, 219 F.3d 620, 630–34 (7th Cir. 2000) (finding ineffective assistance where counsel failed to investigate and call additional alibi witnesses because the defendant's location "was *the* issue in the case," and the one alibi witness counsel called had questionable credibility because he had a prior conviction).

Trial counsel's "practical" explanation for why he did not call Dr. Corliss as a witness also fails. Trial counsel testified

that he did not call Dr. Corliss because the pathologist told him the medical examiner's conclusions in the report were well-reasoned. But the medical examiner's conclusion that there was an interval of survival was not contained in her report. And when trial counsel spoke with Dr. Corliss in April, trial counsel still had the mistaken belief—memorialized by his email a mere ten days before trial—that the medical examiner would testify that death was immediate. So while it follows that at the time trial counsel spoke with Dr. Corliss there was no contradiction between Dr. Corliss's opinion and the medical examiner's perceived opinion, when trial counsel realized that the medical examiner disagreed on the immediacy of death, his decision to not call his pathologist cannot reasonably be called "practical." For these reasons, the state appellate court unreasonably applied *Strickland* when it determined that counsel did not perform deficiently because he had strategic and practical reasons for his approach to Dunn's no-causation defense.

None of the state appellate court's stated reasons for finding trial counsel's performance satisfactory are reasonable. Further, the Wisconsin Court of Appeals failed to adequately consider or address counsel's decision to disregard the exculpatory expert reports he was informed about shortly before trial. Dunn's counsel did not seek out further information on the reports or ask for a continuance. While "reasonably diligent counsel may draw a line when they have *good reason* to think further investigation would be a waste," *Rompilla*, 545 U.S. at 383 (emphasis added), here trial counsel only had a bad reason not to follow up: his inaccurate belief that he already had a witness who would provide similar testimony. A

tactical decision based on a complete misunderstanding of an essential piece of evidence does not equate to strategy.[3]

Sometime in the days before trial, trial counsel figured out that the medical examiner would not testify as he thought she would. Thus, "[e]ven if defense counsel could have initially believed expert testimony unnecessary," finding out the medical examiner was going to testify that Schuckman did not die immediately should "have alerted any reasonable attorney to the need to rebut with a defense expert." *Woolley v. Rednour*, 702 F.3d 411, 423 (7th Cir. 2012) (finding counsel performed deficiently where he "remained nearly passive in the face of damning" testimony that "effectively hollowed out the core of his client's defense" because he "fail[ed] to retain an expert witness" or "ask for a continuance"). Given that he knew that he no longer could elicit this crucial piece of information on cross-examination, his planned approach to the no-causation defense at trial cannot reasonably be viewed as strategic. Rather than calling Dr. Corliss to testify or requesting a continuance to obtain the exculpatory reports, he decided to rely on his cross-examination of the medical examiner to advance the no-causation defense. But the information he could elicit from her—that Schuckman sustained multiple injuries—only provided weak support that Dunn's slap was not a substantial factor in Schuckman's death. He failed to offer any evidence to rebut the medical examiner's conclusions that there was an

---

[3] Trial counsel's testimony that Dunn would not have wanted a continuance to wait for the completed expert reports does not render his decision to not investigate further strategic. Counsel had a fundamental misunderstanding about how a key witness would testify, which prevented him from being able to accurately advise his client on the state of the evidence and the potential necessity of a continuance.

interval of survival and all Schuckman's injuries contributed to his death. He did not present any evidence whatsoever that Schuckman died immediately—despite having both a forensic pathologist who had expressed this belief and the information about exculpatory expert reports that suggested that Schuckman died on the back patio and did not stand upright after the fatal injury.

Trial counsel's approach to presenting a no-causation defense was thus, "in light of all the circumstances … outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. This finding does not mean that counsel must always interview a medical examiner or retain an expert witness to be considered effective. "[I]t may be reasonable," in some cases, "to rely on cross-examination to cast general doubt on the government's version of events." *Woolley*, 702 F.3d at 424. It also may be reasonable to rely on the medical examiner's report, or to not seek out additional exculpatory information if it were cumulative. But here, trial counsel's investigation and presentation of a no-causation defense rested on an erroneous belief, until days before trial, that he would be able to elicit a crucial piece of information from the medical examiner. He then remained "nearly passive in the face of damning" testimony from the medical examiner that Dunn caused Schuckman's death. *Woolley*, 702 F.3d at 423. We thus conclude that Dunn's trial counsel's performance was deficient under *Strickland*.

### B. Prejudice

We next turn to *Strickland*'s prejudice prong, which we review de novo in light of the state appellate court's silence on this point. To prevail, Dunn must "affirmatively prove prejudice," meaning that "there is a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 693–94. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. This does not require Dunn to prove that his "counsel's deficient conduct more likely than not altered the outcome in the case," *id.* at 693, but the "likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

We conclude that there is a reasonable probability that the result would have been different if Dunn's trial counsel had adequately investigated and presented evidence that Dunn did not cause Schuckman's death. Given the evidence that Schuckman was seen alive and apparently unharmed after the slap meant that the medical examiner's testimony at trial was key in linking Dunn's slap to Schuckman's death. Her testimony that all Schuckman's injuries contributed to his death and there was no reason to think he died quickly went unrebutted at trial. Dr. Stephens's testimony cast significant doubt on these conclusions and is sufficient to undermine our confidence in the outcome. *See Mosley*, 689 F.3d at 851 (holding that where important testimony was not offered and the evidence against the defendant was not overwhelming, *Strickland*'s prejudice prong was satisfied).

Dr. Stephens's testimony contradicted the medical examiner's in two key ways. First, while the medical examiner testified that all Schuckman's injuries contributed to his death, Dr. Stephens opined the skull fracture and laceration to the back of Schuckman's head were the substantial cause of his death and he likely would have survived his other injuries. Second, Dr. Stephens disagreed with the medical examiner about how long Schuckman likely survived after sustaining

the skull fracture. The medical examiner testified she had no reason to think that Schuckman would have died immediately from his injuries because they did not affect his vital center; Dr. Stephens testified that Schuckman would have been rendered immediately unconscious, would be unlikely to be able to sit up afterward, and would have died within minutes. An analogous set of facts arose in *Rogers v. Israel*, 746 F.2d 1288, 1293–94 (7th Cir. 1984). There, like here, a crucial question in the case was whether the victim in a bar fight was immediately incapacitated by his injuries. Trial counsel in both cases failed to rebut the state's pathologist's testimony that incapacitation would not occur immediately, though the counsel could have presented such expert testimony. In *Rogers*, we found that expert testimony regarding the immediacy of incapacitation "was critical to the presentation of the defense," and so there was a reasonable probability that the jury would have had a reasonable doubt about the defendant's guilt if it had been presented. *Id.* at 1293. We find the same here.

In addition to rebutting some of the medical examiner's testimony, Dr. Stephens's testimony undermined the state's theory of the case in other ways. He testified that the laceration on the back of Schuckman's head would bleed immediately and profusely. Yet there was no blood found in the parking lot, and Schuckman did not have blood dripping down the back of his head. Dr. Stephens's opinion based on these facts—that Schuckman was injured on the back patio rather than in the parking lot—thus contradicted the state's theory of the case. The medical examiner conceded at the postconviction hearing that nothing in her testimony was inconsistent with Schuckman receiving his injuries on the back patio.

We recognize that the medical examiner's testimony was not the only incriminating evidence in this case. Even at a hypothetical trial where counsel presented testimony like that of Dr. Stephens's, the jury would have learned that Schuckman's cell phone was found at Dunn and Crochet's hotel, Schuckman's DNA was found on Crochet's pants, and Crochet was spotted walking from the direction where Schuckman was found later that night. "Logically, a verdict weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Cook*, 948 F.3d at 909. But we do not find this other evidence constitutes overwhelming support that Dunn is guilty of felony murder. Rather, much of this evidence potentially incriminates Crochet. It was Crochet who had Schuckman's blood on his pants, and Crochet who was witnessed leaving the bar, and ten to fifteen minutes later, walking away from the direction where Schuckman was later found. But Dunn's guilt is not necessarily tied with Crochet's—the same witness who testified he saw Crochet walking away from the area where Schuckman was found also testified that he saw Dunn seated in the pickup truck at that time. And notably, despite the forensic and eyewitness testimony implicating Crochet in Schuckman's death, Crochet was able to leverage the exculpatory expert reports to negotiate a plea bargain for a time-served sentence.

There is of course a chance that even if the jury had heard testimony like that offered by Dr. Stephens, it would have nonetheless convicted Dunn for felony murder. It may have still found that Dunn's slap caused the skull fracture, or that Dunn was liable as a party to a crime based on the evidence against Crochet. But the fact that no evidence was offered about the timing and location of Schuckman's death

substantially undermines our confidence in this result. This is sufficient to establish prejudice under *Strickland*.

### III. Conclusion

The Wisconsin Court of Appeals unreasonably applied *Strickland* when it determined that Dunn's trial counsel did not perform deficiently. Dunn was prejudiced as a result of his trial counsel's errors, and so the district court's grant of habeas relief is

AFFIRMED.