In the

# United States Court of Appeals

## For the Seventh Circuit

No. 22-2393

TYLER A. GONZALES, formerly known as Tyler A. Montour,

*Petitioner-Appellant,*

*v.*

CHERYL EPLETT, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:19-cv-01604-WCG — **William C. Griesbach**, *Judge.*

ARGUED MARCH 31, 2023 — DECIDED AUGUST 9, 2023

Before EASTERBROOK, RIPPLE, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Tyler Gonzales[1] was convicted in 2015 of charges arising out of a shooting in a parking lot. He is currently serving a 25-year prison sentence, which will be followed by 15 years' extended supervision. Believing that he

---

[1] Throughout most of the proceedings, petitioner was using the name Tyler A. Montour. He changed his name at some point, however, and is now known as Tyler A. Gonzales. We use his current name.

received constitutionally ineffective assistance of counsel at his trial, he has turned to federal court for a writ of *habeas corpus*. The district court concluded, however, that Gonzales has not satisfied the stringent requirements for such relief, and so it denied his petition. This is one of those cases in which the standard of review matters. We are deeply troubled by the performance of defense counsel. But 28 U.S.C. § 2254 requires us to defer to a state court's decision unless it is not only wrong, but unreasonable. We conclude that the state court did not stray beyond that extreme limit, and so we affirm.

**I**

The events underlying this case unfolded during the early morning hours of June 12, 2015. Petitioner Gonzales had gotten into an altercation with Adrian Valadez and Blake Kruizenga at the Hawk's Nest Bar. After a heated argument, Gonzales left the bar and got into a car with his brother-in-law, Pedro Gonzalez. As Pedro Gonzalez drove away, Gonzales shot from the passenger window of the car toward Kruizenga and Valadez, who were standing in the parking lot. Gonzales fired the gun about six or seven times and hit Kruizenga in the leg.

Charged under state law with attempted first-degree intentional homicide and being a felon in possession of a firearm, Gonzales was offered an opportunity to plead guilty to recklessly endangering safety and unlawful possession of a firearm for a recommended ten-year sentence of confinement. Under Wisconsin law, recklessly endangering safety is a lesser-included offense of attempted first-degree intentional homicide, meaning that a defendant who commits attempted intentional homicide necessarily commits reckless

endangerment as well, but the lesser charge carries a milder punishment.

Attempted first-degree intentional homicide requires the intent to cause the death of another human being and steps toward the commission of that crime. See Wis. Stat. § 940.01 (defining first-degree intentional homicide); Wis. Stat. § 939.32 (defining attempt). To show intent, the prosecution must prove that the defendant "has a purpose to do the thing or cause the result specified, or is aware that his or her conduct is practically certain to cause that result." Wis. Stat. § 939.23. First-degree recklessly endangering safety is defined as "recklessly endanger[ing] another's safety under circumstances which show utter disregard for human life." Wis. Stat. § 941.30. Attempted first-degree intentional homicide carries a maximum prison sentence of 40 years, as compared with first-degree recklessly endangering safety, for which the sentence is capped at 7.5 years. The maximum sentence for unlawful possession of a firearm is five years' confinement.

After conferring with his defense counsel, Melissa Frost, Gonzales rejected the plea deal and requested a speedy trial. Frost advised Gonzales that she believed they should seek a full acquittal. Her assessment rested heavily on her prediction that the state was going to have a hard time getting the central witnesses, Valadez and Kruizenga, to testify, particularly if Frost and Gonzales succeeded in securing an early trial date. Kruizenga had absconded from probation and the state was still looking for him. All the witnesses had lengthy felony records, and their accounts of the evening varied. They were drunk and there were inconsistencies in their stories about where they were standing, the color of the car, how many shots were fired, and whether there was a third passenger in

the car. Frost believed she could capitalize on witness unavail-ability and the impeachment fodder to create reasonable doubt about whether Gonzales was the shooter.

It turned out that Frost had been far too optimistic. At trial, it quickly became clear that all the state's witnesses had been located, were cooperating, and were going to testify that Gonzales was the shooter. Worse yet, Pedro Gonzalez had been offered immunity and was prepared to testify that he drove the car while Gonzales shot at Valadez and Kruizenga. The state's case was thus impressive, featuring three eyewitnesses, all of whom would identify Gonzales as the shooter.

Seeing the writing on the wall at the end of the second day of trial, Gonzales confidentially admitted to Frost that he was the shooter. He asked her if he should testify and explain that he was not trying to hit anyone and was just trying to scare Valadez and Kruizenga. Frost advised Gonzales not to do that. By that point in the trial, she thought that Gonzales's testimony would guarantee conviction; he would be caught dead to rights on the unlawful possession count and, even if he managed to undermine the state's showing of intent to commit attempted intentional homicide, he very well could face conviction on that count as well. Frost had reserved her opening statement until after the state's case-in-chief, but she did not make any adjustments to her presentation of the case, despite Gonzales's private confession to her. She proceeded with their "all-or-nothing" strategy, pursuing acquittal rather than trying to focus the jury on the reckless-endangerment count. The gamble did not work: the jury convicted Gonzales of the more serious crime.

Frost expressed discomfort with her strategy as early as sentencing. She described the trial as bizarre and felt

responsible for not pursuing the lesser-included offense. And our review of the record indicates that there is a great deal to criticize in her performance. Her cross-examination of the state's witnesses failed to bring out material inconsistencies in the testimony; worse, it invited the state's witnesses to reiterate their testimony that Gonzales was armed and shooting toward them. In addition, rather than coming up with a revised trial plan in the evenings, she wasted time reviewing jail calls to see if there was evidence of a side deal or an undisclosed police report. Her cross-examination of Pedro Gonzalez also failed to shake his story.

After sentencing, the court appointed a new lawyer to represent Gonzales, and new counsel filed for post-conviction relief as permitted by Wisconsin law, Wis. Stat. § 974.02, raising a claim of ineffective assistance of counsel. See *Strickland v. Washington,* 466 U.S. 668 (1984). The Wisconsin trial court held an evidentiary hearing at which it examined Frost's performance. Both Gonzales and Frost testified at the hearing. Frost fell on her sword. She testified that it "never even crossed [her] mind" to argue for the lesser-included offense, that she had tunnel vision about pursuing the acquittal, and that she had felt no need to adjust her trial strategy even when it became clear that the state's witnesses were all available. Gonzales testified that he and Frost never seriously discussed the lesser-included offense.

It also turned out that three jurors told Frost after the trial that they did not understand the difference between attempted first-degree intentional homicide and first-degree recklessly endangering safety. They disclosed that the jury just picked attempted intentional homicide for the conviction because they knew Gonzales had been the one who pulled the

trigger. Gonzales wound up with a sentence of 25 years in prison, to be followed by 15 years' extended supervision. Of that, 20 years was for the attempted first-degree intentional homicide, twice what the state had offered before trial, and nearly three times the statutory maximum Gonzales would have faced if the jury had convicted on the lesser-included offense.

The Wisconsin trial court concluded that Frost's performance, taken as a whole, did not fall below the constitutionally permissible minimum. Pursuing acquittal was reasonable, it concluded, based on the character of the eyewitnesses, and it thought that Frost's decision not to shift her strategy mid-trial fell within the boundaries of acceptable legal strategy. It agreed with Frost that Gonzales's suggested testimony would have guaranteed a conviction. The court also suggested that it would have been difficult for Frost to argue both for acquittal and, in the alternative, for a conviction only on the lesser-included offense. Even though inconsistent defenses are not strictly forbidden, the court observed that they are often incredible to a jury. The court also briefly addressed prejudice and concluded that there was sufficient evidence to convict Gonzales of attempted intentional homicide, and so the outcome would not have changed even if Frost had adjusted her approach.

The Wisconsin appellate court affirmed the trial court's bottom line, but it rested its opinion solely on Frost's performance, declining to reach the issue of prejudice. Gonzales's lawyer then filed a no-merit petition with the Supreme Court of Wisconsin pursuant to Wisconsin's Rules of Appellate Procedure. See Wis. Stat. § 809.32(4). Gonzales personally did not avail himself of the option of filing a supplemental petition.

The state supreme court denied the no-merit petition in a standard order.

Gonzales then turned to federal court with a petition under 28 U.S.C. § 2254 for a writ of *habeas corpus*. The state moved to dismiss the petition for failure to exhaust his state remedies. It contended that Gonzales's failure to file a supplemental petition in the state supreme court was fatal to his request for *habeas corpus* relief. The district court denied the motion to dismiss, but it ultimately ruled in the state's favor on the ground that the state appellate court (the last state tribunal to issue a fully reasoned opinion, see *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018)), had not been unreasonable when it found that Frost's performance was not constitutionally deficient. It also expressed skepticism that Gonzales could demonstrate prejudice. Nonetheless, it found that reasonable jurists could reach a contrary decision, and so it issued a certificate of appealability. This appeal followed.

## II

In this court, the state begins by reiterating its exhaustion argument, which if accepted would lead to a finding of procedural default for Gonzales. To reach the merits of Gonzales's petition, we must ensure that he fairly presented the claim "through one complete round of review in state court." *Brown v. Eplett*, 48 F.4th 543, 552 (7th Cir. 2022) (citing *Baldwin v. Reese*, 541 U.S. 27, 29 (2004)). We assess *de novo* the district court's ruling on procedural default. *Hicks v. Hepp*, 871 F.3d 513, 530 (7th Cir. 2017).

The state argues that Gonzales defaulted by failing to comply with the petition procedure established by Wisconsin law. See Wis. Stat. § 809.32. If an attorney concludes that a direct

appeal to the Supreme Court of Wisconsin lacks "any argua-
ble merit within the meaning of *Anders v. California*, 386 U.S.
738 (1967)," the attorney must file a no-merit petition. That
petition must include a statement of the case, and counsel
must append the lower court opinions. If the defendant disa-
grees with that assessment and believes the appeal has merit,
he or she must then file a supplemental petition stating the
issues for review and an argument for why review is proper.
See Wis. Stat. §§ 809.32(1) & (4). Gonzales did not file a sup-
plemental petition; instead, he relied on his attorney's no-
merit filing.

While this does not strictly comply with Wisconsin proce-
dural rules, the failure to file a supplemental petition does not
automatically doom a *habeas corpus* petition. The record as a
whole is what matters. The federal court should determine
"whether the petitioner has fairly presented his federal claim
to the state court," looking at factors such as (1) the presence
of a federal constitutional analysis; (2) the citation to state
court cases that apply constitutional analysis; (3) the framing
of the claim in accordance with "a specific constitutional
right"; and (4) the use of a fact pattern "that is well within the
mainstream of constitutional litigation." *Brown*, 48 F.4th at
552. "All four factors need not be present to avoid default … ."
*Id.* (quoting *Whatley v. Zatecky*, 833 F.3d 762, 771 (7th Cir.
2016)).

These considerations weigh in Gonzales's favor. Even
without a supplemental petition, the state supreme court had
a comprehensive account of the case. The no-merit petition
filed by Gonzales's attorney alerted the court to the potential
constitutional arguments in the case and thus did what an *An-
ders*-type brief is intended to do. The statement of facts

explained both the deficiencies in Frost's performance and the prejudice Gonzales faced as a result. The petition also cited the relevant state-court cases, including *State v. Machner*, 92 Wis. 2d 797 (Wis. Ct. App. 1979), which establishes the Wisconsin post-trial procedure for dealing with ineffective assistance of counsel claims, and *State v. Maloney*, 2005 WI 74, a case from the Supreme Court of Wisconsin that follows the *Strickland* standard. Even though the no-merit petition did not directly engage in a federal constitutional analysis, not every factor needs to be present to preserve a petitioner's claim. We have considered the state's assertions otherwise, including its analogies to other cases involving Wisconsin no-merit petitions, and find none persuasive. We thus reject the procedural-default argument and move to the merits of Gonzales's petition.

**III**

The standard of review for a *habeas corpus* petition is established by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). We may issue the writ only if the state-court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Though we must defer to any reasonable state court decision, our review of the district court's decision is *de novo*. See *Bell v. Hepp*, 70 F.4th 385, 389 (7th Cir. 2023). And since "AEDPA deference only applies to issues that the last reasoned state court decision reached on the merits," we conduct

a *de novo* review of issues that were not reached on the merits. *Dunn v. Jess*, 981 F.3d 582, 591 (7th Cir. 2020).

But before we turn to AEDPA, it is important to understand Gonzales's underlying claim. The Sixth Amendment right to the assistance of counsel is a right to *effective* assistance. *Strickland,* 466 U.S. at 686. In order to show ineffectiveness, the defendant must prove that (1) "counsel's representation fell below an objective standard of reasonableness … under prevailing professional norms," and (2) "the deficient performance prejudiced the defense." *Id.* at 687–88. Even without AEDPA, this is a tough standard to meet, given the Supreme Court's admonition that "[a] court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance. *Harrington v. Richter,* 562 U.S. 86, 104 (2011) (quoting *Strickland,* 466 U.S. at 689). Layering AEDPA on top of that standard makes it even harder to prevail on this type of claim.

The central question in this case is whether Frost provided constitutionally ineffective assistance, taking her performance as a whole. Gonzales argues that Frost exhibited plan-continuation bias, or "tunnel vision"; she remained doggedly focused on acquittal even after it became impossible, never updating her understanding of the evidentiary landscape or adapting to the realities of the case's developments, and her cross-examinations were a disaster. Gonzales contends that Frost's decisions were unreasoned, rather than the product of intentional strategy. This distinction is significant; the Supreme Court has told us to defer to an advocate's "strategic choices about which lines of defense to pursue," but only if those choices are "based on professional judgment" and

"assumptions [that] are reasonable." *Id.* at 681 (internal quotations omitted).

To evaluate Frost's performance and her failure to pivot, it is helpful to examine her decisions at three critical moments: 1) before trial, when she advised Gonzales against taking the plea offer; 2) mid-trial, when she continued to pursue acquittal even though she knew that all the state's witnesses were available, and she also had Gonzales's confidential confession; and 3) at closing argument, when she did not argue for the lesser-included offense.

For the first point, we now know in hindsight that it was a mistake for Gonzales and Frost to pass on the plea deal that was offered. But Frost's choices at that time fell within the wide range of professional judgment and reasonable assumptions. Frost considered the availability of the eyewitnesses, their credibility, the inconsistencies in their accounts of the shooting, and other available impeachment fodder such as the eyewitnesses' lengthy criminal records. As the district court noted, Frost also accounted for the "prosecutor's trial skills and his potential for alienating the jury." Her choice to proceed to trial and pursue full acquittal thus passed muster under the applicable deferential standard.

Frost's choices become less defensible as we move along the timeline. As of mid-trial, she continued to pursue acquittal even though she knew by then that the state's case was much stronger than she had anticipated. Her expectation that the key eyewitnesses would be unavailable or impeachable was foiled; all eyewitnesses appeared in court and named Gonzales as the shooter, including Gonzales's own brother-in-law. Gonzales himself sensed that things were not going well, and so he offered his own testimony, which would have admitted

to reckless endangerment while undermining his criminal intent for homicide. Since Frost had reserved her opening statement, she was free to incorporate these changes into her presentation to the jury. She had managed to elicit evidence that would have helped her build a case for the lesser-included offense. There were statements from a ballistics officer that bullets were recovered from targets that were low to the ground, and Kruizenga was hit low to the ground, just slightly above his ankle. Another testifying officer explained that someone firing a gun with the intent to kill would aim at "center mass." Frost could have emphasized this evidence to illustrate that Gonzales was aiming low, with no intent to kill.

But that pivot would have been difficult, and we must resist the lure of hindsight. Frost reasonably could have concluded, in the exercise of her professional judgment, that such a pivot would have been dangerous for Gonzales. It would have guaranteed his conviction on at least two counts—reckless endangerment and unlawful possession of a firearm. And through cross-examination she had brought out problems with witness credibility and inconsistencies in eyewitness accounts. As the state pointed out at oral argument, her cross-examinations elicited several significant admissions from the state's eyewitnesses. Those admissions included Pedro Gonzalez's concession that he lied to police when they questioned him the day after the shooting, his forfeiture of an unlawfully owned gun, and his deletion of text messages between him and petitioner Gonzales from the night of the shooting. Frost also elicited the facts that Pedro Gonzalez was offered immunity for his testimony, and that he had a motive to harm Kruizenga and Valadez in retaliation for their involvement in a home invasion at his house. Frost's cross-examinations also brought out Valadez's admission that he told police that

Pedro Gonzalez was a passenger in the car, not the driver. Though ultimately ineffective, these cross-examinations aligned with Frost's acquittal strategy by creating motive and opportunity for Pedro Gonzalez, rather than petitioner Gonzales, to be the shooter. In sum, we can only speculate whether Frost realistically could have shifted her strategy at that point. She had only bad choices, and she may have chosen the best of that bad lot.

The final stage, the closing argument, is the most vulnerable part of Frost's performance. Closing arguments can be significant game changers. Indeed, "no aspect of [partisan] advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment." *Herring v. New York*, 422 U.S. 853, 862 (1975). And we know that three jurors told Frost after the trial that they did not understand the difference between attempted intentional homicide and reckless endangerment during their deliberations. Had Frost been able to clarify the difference, it might have had an effect.

But the simple reality of the situation is that the state had put on a strong case and boxed Frost into a difficult position. The risks of conceding that Gonzales was the shooter were huge, given the evidence supporting the attempted homicide charge, including Kruizenga's testimony that he saw straight down the barrel of Gonzales's gun. Even more damning, Kruizenga was actually hit by a bullet. And as the state trial court emphasized, juries are often skeptical about inconsistent defenses, and so any argument in the alternative about the lesser-included offense might have weakened Gonzales's case. If we give Frost every benefit of the doubt, it is possible that there is just enough to support her decisions at each turn.

Nonetheless, Frost's overall performance is hard to justify, and we are greatly troubled that the idea of strategic adaptation to the state's actual case "never even crossed her mind." Gonzales also makes a good point about plan-continuation bias. An attorney's choice rigidly to pursue a losing strategy certainly can support an ineffective assistance of counsel claim. If we were writing on a clean slate, this would be a close case.

But we are not the primary decisionmakers. This is a *habeas corpus* action, and our role is severely limited by AEDPA. For ineffective assistance of counsel arguments, the Supreme Court has said that the AEDPA layer makes our assessment of counsel's performance (and of prejudice, if that were at issue) doubly deferential. See *Richter*, 562 U.S. at 105. First, as we already have noted, we presume that "counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* at 104. Second, we must defer to the state court's assessment of counsel's performance unless "there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. Gonzales cannot clear the second of those hurdles. Even if we might have found that this is one of the unusual cases in which counsel's performance was constitutionally deficient, we cannot say that there is no possibility for fairminded disagreement on that point.

It is worth noting, as we conclude, that the state trial court (whose findings strongly influenced the state appellate court) seems to have reached its decision in large part because of the strength of the state's case when all was said and done. It thought that there was little Frost could have done, in the face of that evidence. As we already have discussed, the record

showed, with little contradiction, that Gonzales shot in the direction of the eyewitnesses. This undermines his insistence that he was shooting at the ground and not trying to hit anyone. And the state trial court reasonably concluded that the act of shooting at a person supports a conviction for attempted first-degree intentional homicide. The court put the point bluntly, using language that mirrors the Wisconsin definition of criminal intent: "Anyone with half a brain knows that if you fire a gun in the direction of somebody, their death could occur, that you are aware that their death could occur and is probable to occur."

Given the standards that bind us, we conclude that Gonzales has not advanced a successful claim for *habeas corpus* relief based on ineffective assistance of counsel. Though Gonzales marshals strong arguments, we cannot say that the state appellate court unreasonably applied *Strickland* or relied on unreasonable determinations of fact.

## IV

We AFFIRM the district court's denial of Gonzales's petition for a writ of *habeas corpus*.